[Civ. No. 11075. Third Dist. May 27, 1966.]

ANN WOMACK, Plaintiff and Respondent, v. WILLIAM L. WOMACK, Defendant and Appellant.

Winters, Winters & Golla, Winters & Winters, Robert K. Winters and Roger Golla for Defendant and Appellant.

Stanley Pugh and Francis T. Cornish for Plaintiff and Respondent.

PIERCE, P. J.—The trial court's interlocutory decree granted both the husband, William, and the wife, Ann, a divorce. Neither objects to this[1] nor to the division of the nominally-valued community property. The principal controversy on appeal seethes over property the status of which the court declined to determine. Its refusal was upon the ground that the parties, as to that property, were before the court with "unclean hands."

Our reversal is based upon the trial court's refusal to consider the question of what appears to us to have been a "purging" by William of his prior conduct.

The facts are these:[2] on May 29, 1963, Ann instituted this action for a divorce charging William with extreme cruelty. The couple had been married since October 3, 1959 (less than four years). Ann's verified complaint alleged there was no community property but there was property described in the complaint, a parcel of land (Lot 3 of Al Fresco Tract in Tehama County) improved by two houses, one being the residence of the parties. (The other house, built before the marriage, was sold shortly thereafter.) It is alleged that said

---

[1]There is a contention by William that corroborated evidence did not establish that Ann was a California and a Tehama County resident for the requisite statutory periods. (Civ. Code, § 128.) Allegations by Ann in her complaint were admitted in William's answer. Ann's testimony showing residence for the requisite period was amply corroborated by overwhelming circumstantial evidence. This was sufficient to support the decree awarding her a divorce. (*Muther* v. *Muther,* 212 Cal.App.2d 778 [28 Cal.Rptr. 200].)

[2]All facts stated necessary for the conclusion we reach are from the record in this case. Since, however, one phase of the action must be retried and since the trial court may judicially notice the record in the divorce action, William L. Womack, Plaintiff v. Wilma M. Womack, Defendant, Tehama County No. 10208 (hereinafter "Wilma's divorce") (see *Flores* v. *Arroyo,* 56 Cal.2d 492, 496 [15 Cal.Rptr. 87, 364 P.2d 263]), we have examined that file and refer to various uncontroverted facts appearing therein. We do so because at the new trial these facts will be relevant to the end that complete justice may be done to all parties.

property was "the sole and separate property of plaintiff, having been acquired by her prior to said marriage for a consideration in excess of $20,000.00." The furniture and furnishings of a home on a portion of said property were also alleged to be Ann's separate property, together with a Chrysler automobile.

The deed by which Ann had acquired title to all of the property was made an exhibit to the complaint. It was a grant deed from William, dated October 2, 1959 (the day before their marriage). By his answer William denied Ann's ownership of the described real property. He alleged that it was his separate property and was "held by plaintiff for the benefit of defendant as a constructive trustee." William cross-complained for a divorce, also charging extreme cruelty.

Ann's allegation in her complaint that William had deeded the property to her for a consideration of $20,000, or any other sum, was a complete fabrication. As the court found (and there is no dispute in the record on this) the transfer had been made solely to prevent William's former wife, Wilma, from "tying up" the property (i.e., to prevent her imposition of a lien upon it) in the event he became delinquent in support payments.

Wilma and William had been married in 1938. They had two children. When William sued Wilma for a divorce in September 1957 both of the children were minors. One of them, a son, is now an adult. The second child, a daughter, Sharron, is now 14 years old. On May 16, 1958, Wilma was granted an interlocutory decree of divorce from William. In that decree the real property referred to above was found to be the community property of the parties, the court awarded Wilma the sum of $8,000 as her "equitable share." Wilma was awarded alimony of $75 per month and an additional sum as her attorneys' fees. Title to the real property was vested in William, said title to be in trust but only until the payments stated above had been made: *thereafter the property was to be his free from any trust restrictions.*

On October 2, 1959 (the day that William's deed to Ann was made) a stipulation regarding a final decree of divorce was made between the parties to Wilma's divorce. It recited that $9,959 had been deposited by William with the Tehama County Title Company, $8,000 of which was to be paid to Donald B. Webster for Wilma's share of the property. Webster was Wilma's attorney and he had been appointed her guardian because of her incompetency; $1,350 was to be for Wilma's benefit in satisfaction of delinquent support pay-

ments; and most of the balance was to be paid for attorneys' fees and costs. These payments were made and the final decree was entered. At that point title was vested in William, the obligations of the trust having been fulfilled.

William is a bricklayer by trade and there is evidence that he had built the two houses which are on the property. At the time of the transaction mentioned above approximately $20,000 was owed to a bank, secured by a deed of trust on this property. To raise the money necessary to pay Wilma, William had borrowed $4,000 from his brother Vernon and a nephew and an additional $6,000 from the bank, evidenced by two promissory notes, each in the sum of $3,000, one signed by William and one by Ann. In 1960 the house mentioned above was sold to one Edwards. The proceeds were applied to retire the bank notes with interest and to reduce the deed of trust indebtedness.

Wilma, at the time of her divorce from William, had gone back to her former home in Colorado. Shortly thereafter she became an inmate in a state mental institution and remained there for some time. Later deemed sufficiently sane to be released, she obtained employment as a domestic servant and has apparently been so employed ever since. The daughter, Sharron, at the time of her mother's divorce had attended a parochial school at Grass Valley. Sometime thereafter she went to live with William and Ann. Since their separation she has lived with her father.

By October 3, 1960, William had fallen into arrears again in the sum of $900 in his support payments to Wilma. In court proceedings by Wilma to recover this amount, William stated nothing in an affidavit about his sale of the house to Edwards or of the application of the proceeds. He did not list the home as an asset. Ann throughout the marriage had full-time employment and was self-supporting. William did not misrepresent this fact to the court. (In fact he had reported it in an affidavit on February 11, 1960, when he had sought a modification of the alimony award.) In December 1960 William was adjudged to be in contempt for nonpayment of alimony and was given until July 3, 1961, to pay his arrearages. His motion for a reduction of alimony was denied. The judge's memorandum referring to this contempt proceeding states: "It is apparent to the Court that this man has been much upset by the irrational conduct of his wife and, if annoyance is justification, he has reason to be upset. He obviously fails to bear in mind that mental illness requires great forbearance

and charity. It is also apparent to the Court that the plaintiff does not propose to meet the Court's direction if there is any way in which he can avoid doing so. This Court is fully aware of the probable extreme hardship imposed upon the plaintiff and is fully aware that others in like circumstances might chafe against the situation in which he finds himself.''

The message contained in this statement did not immediately get through to William. Although he cured the contempt for which he had been charged and found guilty, he became delinquent again. An affidavit filed by Wilma averred that from July 1961 until October 1962 no payments were made. During this period, however, William had had a heart attack (a coronary) for which he had been in the hospital, followed by a bed convalescence. On April 23, 1962, he obtained employment by Tehama County as a building inspector.

In November 1962 (without court order) William paid Wilma $950. A stipulation in the record of that action acknowledges receipt of that sum as payment in full of all sums owing. William testified that he has paid all alimony since, when and as due, and there is nothing in the record disputing that testimony.

William testified (and this is corroborated) that to support himself and daughter and make his monthly support payments to Wilma (whose alimony, by stipulation, has been reduced to $25 per month) he has been ''moonlighting''[3] to meet his obligations.

### The ''Clean Hands'' Doctrine Applies if There was no Purging by William of his Fraud

Unless the ''clean hands'' doctrine applies in this case, it is clear that the court had power in its decree to determine the ownership of the real property in question and to quiet the title thereto as between the parties since each party claimed it as separate property and the issue of ownership had been submitted to the court for determination. (*Barker* v. *Barker*, 139 Cal.App.2d 206, 210 [293 P.2d 85]; *Roy* v. *Roy*, 29 Cal.App.2d 596, 603 [85 P.2d 223].)

Both before the trial court and here respondent Ann urges applicability of the equitable maxim that he who comes into equity must come with clean hands; and that a party who has been guilty of conduct in violation of the fundamental concepts of equity will be refused relief. Witkin states that the

---

[3]From the divorce file in Wilma's action it appears that William has lost recently his building inspector's job as a result of this ''moonlighting.''

rule means: "A court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both are *in pari delicto*." (4 Witkin, Summary of Cal. Law (7th ed. 1960) § 7, p. 2791.) This doctrine has been applied by this court to preclude recovery of property transferred to defraud a wife. (*Potter* v. *Boisvert*, 117 Cal. App.2d 688 [256 P.2d 625].)

In addition to its findings the trial court in this action filed a written opinion in which it is stated:

"[E]ach of the parties hereto agreed and conspired together in the Husband's plan to transfer the subject real property to Wife with the intent to deceive and defraud Husband's former wife by concealing the ownership of the subject real property thereby making it difficult, if not impossible, for her to levy on the same to satisfy Husband's obligation to said former wife.

"In regards to the subject real property this court will leave the parties in precisely the same situation in which it found them. The court will not grant affirmative relief to either of the parties hereto in respect to said real property because neither of the parties hereto comes before this court with clean hands in respect to the same for the reasons above indicated. . . ."

The trial court, however, has not left the parties "in precisely the same situation in which it found them." The record shows that in November 1962 William had paid Wilma all back alimony and has not been in arrears since; and that he has accomplished this notwithstanding the fact that he, during this period and perhaps before, has experienced more than his share of the "slings and arrows of outrageous fortune." By the terms of the Wilma divorce decree William was to have a clear title to the real property after paying Wilma the money (almost $10,000), which in fact he did pay. By this decree Ann, whom the court decreed was the guiltier of the two,[4] is now in possession of the home and may remain there for life, enjoying all its rents, issues and profits. Effectually, she has been given a life tenancy to property as to which she has no claim whatever. True, she does not get a fee simple title but she made not the slightest pretense at the trial she was ever entitled to that or any interest therein.

---

[4]The court in its memorandum opinion stated: "Were the court to attempt to weigh or measure the blame of one party herein against the other, the fault of Wife would be the heavier for the testimony before the court brands her as an adulteress."

All that this decree accomplishes is to make it difficult, if not impossible, for William to continue to meet his obligations to Wilma and at the same time support himself and his 14-year-old daughter, Sharron (now living with her father in a home in Gerber). Thus, Wilma and Sharron are prime losers by the decree.

William loses, Wilma and Sharron lose, Ann gains a windfall and the honor of the court is vindicated. But, as the court (per Justice Peters) states in *Nealis* v. *Carlson*, 98 Cal.App.2d 65, at page 69 [219 P.2d 56] : "It is no answer to say . . . that the fraud was on the court . . . and that the court, in order to vindicate its honor, should vacate the decree. . . . *A court should, of course, preserve its integrity, but it is neither proper nor necessary to sacrifice justice in order to vindicate the honor of the court.*" (Italics supplied.)

### The Full Facts of This Case Must be Reexamined to Determine Whether Equity Will be Served by Applying the Clean Hands Doctrine.

In *Carman* v. *Athearn* (1947) 77 Cal.App.2d 585 [175 P.2d 926] (hearing by Supreme Court denied) a husband deeded certain lots to his second wife for the purpose of defrauding his first wife and other creditors by making it impossible for them to collect certain claims due them. However, thereafter the claims of the first wife were paid and the husband settled the claims of his other creditors. The court (per Peters, P. J.) held (on p. 598) : ". . . Under such circumstances the law is well settled that the 'clean hands' doctrine has no application. (*Stockwell* v. *McAlvay*, 10 Cal.2d 368 [74 P.2d 504] : Annotation 4 A.L.R. 44, particularly at p. 59: cases collected 30 C.J.S. 487, § 98 : 2 Pomeroy's Equity Jurisprudence (5th ed.), p. 94, § 399.)" The statement of facts in *Carman* does not disclose whether the husband's payment of the wife's claim had been voluntary or involuntary. If the former, it would be a fact *differing* from William's behavior here but it would not be a *distinguishing* fact. In *Stockwell* v. *McAlvay*, 10 Cal.2d 368 [74 P.2d 504], cited by the court in *Carman*, the claim of the defrauded party had not been paid voluntarily: it had been by an involuntary levy and collection by sale on execution.

Sound reason supports the rule of the *Carman* case. As stated in *Nealis* v. *Carlson, supra*, 98 Cal.App.2d 65 (on p. 69) : ". . . A person is not placed forever entirely outside the protection of the law in a particular transaction, because, for-

sooth, some time in the distant past he was guilty of an improper act.''

If, as would appear, William has fully and fairly purged himself of his fraud upon Wilma, equity will not be served by applying an equitable maxim to thwart justice. Whenever an inequitable result would be accomplished by application of the ''clean hands'' doctrine the courts have not hesitated to reject it. See *Soon* v. *Beckman*, 234 Cal.App.2d 33 [44 Cal.Rptr. 190] (where the doctrine was held to be waived) : *Wiley* v. *Wiley*, 59 Cal.App.2d 840 [139 P.2d 950] (where the ''unclean hands''—the sterilization of the husband at the wife's request—was unconnected with the grounds for annulment—the wife's refusal of marital intercourse) : *Nealis* v. *Carlson*, *supra*, 98 Cal.App.2d 65 (where the appellant was guilty of laches) : *Hall* v. *Hall*, 98 Cal.App.2d 209 [219 P.2d 208] (where of two conspiring parties the plaintiff's conduct was the less culpable) :*De Burgh* v. *De Burgh*, 39 Cal.2d 858, 860 [250 P.2d 598] ; *Kofsky* v. *Smart & Final Iris Co.*, 131 Cal. App.2d 530 [281 P.2d 5], and *Sullivan* v. *Sullivan*, 219 Cal. 734 [28 P.2d 914] (where to apply the doctrine would be against public policy).

The trial court made no finding upon any of the several factors under which—from the facts of this case—the ''clean hands'' doctrine seemingly should have been refused application. It would appear that the court's attention was not called to the exceptions to the ''clean hands'' doctrine—particularly, the effect of a ''purging'' of fraud. Additional evidence will have to be taken on the matter before this issue can be fairly answered, and a reviewing court is not the appropriate forum in which that determination should be made.

The portion of the interlocutory decree appealed from is reversed with instructions to the court to proceed in accordance with the views herein expressed.

Regan, J., and White, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.