[No. B017620. Second Dist., Div. Five. July 13, 1988.]

HEALTH MAINTENANCE NETWORK OF SOUTHERN CALIFORNIA, Plaintiff and Respondent, v. BLUE CROSS OF SOUTHERN CALIFORNIA et al., Defendants and Appellants.

1046

**COUNSEL**

Crosby, Heafey, Roach & May, Chris G. Gasparich, Peter W. Davis, Stephen A. McFeely, James C. Martin, Lascher & Lascher, Edward L. Lascher and Wendy C. Lascher for Defendants and Appellants.

Gibson, Dunn & Crutcher, G. Edward Fitzgerald, J. Robert Post, R. Randall Huff and William E. Wegner for Plaintiff and Respondent.

## OPINION

**BOREN, J.**—Blue Cross of Southern California and other related defendants[1] (collectively referred to as Blue Cross) appeal from the issuance of a permanent injunction prohibiting them from interfering with the operation of plaintiff, Health Maintenance Network of Southern California (Health Net).

### OVERVIEW

The instant action in equity traces its genesis to an attempt by a health insurance organization, Blue Cross, to assert control over an autonomous health maintenance organization (HMO) it helped establish, Health Net.

In 1977, Blue Cross set up Health Net under California nonprofit corporation laws to benefit from various marketing advantages of a federally qualified HMO. At the same time, Health Net was also structured as a nonprofit hospital service plan under the Insurance Code.[2] Both Health Net and Blue Cross were separate legal entities, yet Blue Cross sought to make Health Net a subsidiary company, "operating under the Blue Cross umbrella." Essentially, Blue Cross received additional exposure by which to attract new subscribers, while Health Net benefited from Blue Cross's established subscriber roster, business experience and capital.

Health Net's incorporating articles contained a provision authorizing corporate "members."[3] Health Net's accompanying bylaws provided that its

---

[1] The other defendants are Blue Cross of California, and directors, officers, or attorneys James E. Gordon, Daniel L. Smith, Benjamin Aranda, Milo E. Hall, Ralph A. Van Orsdel, Jr., Angele Khachadour, Roy R. Heimburger and Aaron Low. At times, the parties have referred to Blue Cross of Southern California as "Blue Cross South."

[2] A nonprofit hospital service plan corporation is a corporation organized pursuant to Insurance Code section 11496 which has obtained a certificate of authority from the California Insurance Commissioner pursuant to Insurance Code section 11504.

[3] In nonprofit corporations, members are the functional equivalent of the stockholders in for-profit corporations. Usually, members have the right to elect the board of directors for the nonprofit corporation and to vote on changes to the corporate articles of incorporation or the corporate bylaws. (Corp. Code, § 5056.) Corporations Code section 5056, subdivision (a) defines the term: " 'Member' means any person who, pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote for the election of a director or directors or on a disposition of all or substantially all of the assets of a corporation or on a merger or on a

members would be "designated annually by the Board of Directors of Blue Cross of Southern California." The bylaws also provided that, upon dissolution of Health Net, its residual assets would be distributed to Blue Cross.

For 1983, the Health Net nine-member board of directors was composed of eight of the Blue Cross-selected Health Net members and one nonmember. This board unanimously approved a proposed bylaw amendment eliminating the existence of "members." The board's action was subsequently ratified by written consents obtained from its interlocking corporate members. Approximately one year later, in 1984, Blue Cross claimed to have discovered "inadvertently" Health Net's 1983 bylaw amendment. Blue Cross attempted to negotiate a revocation of the amendment. When the negotiations proved unsuccessful, Blue Cross simply appointed new members who, in turn, purported to replace the existing Heath Net board with new directors. This act prompted Health Net to seek injunctive relief in order to preserve its autonomy.[4] Health Net also sought declaratory relief and damages. Blue Cross cross-complained for damages against the officers and directors of Health Net. (The cross-complaint is not at issue on this appeal.)

The trial court found in Health Net's favor and granted both a preliminary and permanent injunction. Blue Cross appeals. We affirm.

### FACTS

Viewing the record in a light most favorable to the judgment (*Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757]), we recite the following operative facts.

In 1977, Blue Cross (more specifically, Blue Cross South), a nonprofit organization selling "fee for service" health insurance,[5] formed Health Net as an HMO and a nonprofit hospital service plan wherein providers would receive a flat monthly fee per patient regardless of the quantity of service

dissolution . . . . 'Member' also means any person who is designated in the articles or bylaws as a member and, pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote on changes to the articles or bylaws."

[4]In the trial court, Blue Cross maintained that although it did not seek "to control the administration, operation or policy of Health Net," its desire to appoint the Health Net members was ancillary to its objective of having "the ultimate say in the general direction and the future of the organization to which it gave life." However, "control" is defined by Corporations Code section 5045 as meaning ". . . the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a corporation." Clearly, by that statutory definition, Blue Cross sought and continues to seek "control" of Health Net.

[5]Doctors and hospitals are paid on the basis of the actual service rendered to subscribers.

rendered. The marketing advantage which precipitated the decision to establish an HMO stems from a federal requirement that employers offer employees a qualified HMO program if so requested.

Blue Cross spent a year and a half obtaining state and federal certification for Health Net. Under federal law, acquisition of such certification required Health Net to maintain an independent legal existence. (42 U.S.C. § 300e; 42 C.F.R. § 110.108(h).) To comply with then-applicable state procedures, Health Net, as a nonprofit corporation, was required to have "members" instead of shareholders.[6] To further define Health Net's autonomy, Health Net's articles of incorporation provided that the number, qualifications, property interests, and rights of members, inter alia, be set forth in the bylaws.[7] Health Net's bylaws specified a single class of nine members "designated annually by the board of directors of Blue Cross of Southern California."[8] Through 1982, Blue Cross appointed Health Net members, after consulting with Health Net executives.[9]

Thus, the formal relationship between Health Net and Blue Cross as it existed at the inception of Health Net was reflected not in Health Net's articles but in its bylaws. However, the relationship was also shaped by two written agreements, a finance agreement and a service agreement, both dated September 30, 1977. Each agreement was terminable on 120 days' notice by either party. The finance agreement provided that funds advanced to Health Net by Blue Cross, to the extent that such were loans, were to be paid back by Health Net at the prime interest rate.

During the early years of Health Net's life, officers and employees of Blue Cross also served on Health Net's board of directors. Roger Greaves, the president of Health Net, was employed by Blue Cross when officials of Blue

---

[6] Corporations Code sections 9301, 9306, 9602, 9603. (Repealed by Stats. 1978, ch. 567, § 9, p. 1924, effective Jan. 1, 1980.) Health Net is presently governed by the Nonprofit Public Benefit Corporation Law, Corporations Code section 5110 et seq.

[7] Article VI provided that "[t]he authorized number and qualifications of members of the corporation, the different classes of membership, if any, and the property, voting, and other rights and privileges of members shall be as set forth in the Bylaws; provided, however, that the members of this corporation shall have no liability for dues or assessments."

[8] Article III provided, in pertinent part, as follows:

"Members [¶] Section 1. Classes of Membership. This corporation shall have one class of members to be known as 'Members,' the qualifications, rights, and privileges of which are hereinafter in this Article III described. [¶] Section 2. Qualification, Election, and Term of Members. The Members of this corporation shall consist of nine (9) persons designated annually by the Board of Directors of Blue Cross of Southern California, as a sponsoring organization of this corporation. Any vacancies existing in the Members shall be filled by the Board of Directors of Blue Cross of Southern California."

[9] Members were not appointed in 1980 so the existing members held over one year.

Cross suggested he become a Health Net director. Greaves was still employed by Blue Cross when he became president of Health Net.

At various times, Blue Cross officials represented to regulatory agencies that Health Net was a fully independent organization. In a certification application to the federal Office of HMO's (OHMO), Blue Cross, together with Health Net, represented that the latter was an "independent legal entity" which would be directed by an "independent" board of directors and "managed" by individuals "employed by Health Net." In order to convince OHMO officials of Health Net's independence, the application also stated that "the number of Directors representing Blue Cross will be diminished, and Blue Cross Corporate Directors will comprise no more than 1/3 of Health Net's Board of Directors."

In applying for an exemption from the United States Internal Revenue Service (IRS), Blue Cross, again with Health Net, answered an IRS question of whether it was "connected in any way with any other organization" as follows: "Yes, Health Net has entered into a Service Agreement . . . and a Financial Agreement . . . with Blue Cross of So. California, a California nonprofit organization, whereby Blue Cross will provide certain administrative and financial supportive services necessary for the administration of the Health Net health care plan." No mention was made in this disclosure of the provision permitting Blue Cross to designate Health Net corporate members. Also, the referenced service and financial agreements themselves were filed with OHMO, the California Department of Insurance (DOI) and the IRS. These agreements contained the following clause: "4. Health Net Autonomy. Nothing herein contained shall vest in Blue Cross of Southern California any control over the management of the affairs of Health Net or the Plan."

In December 1977, a key Blue Cross administrator requested the DOI to give assistance to Health Net "to allow it to break out of the 'Catch 22' situation [in which] it finds itself between HEW [the United States Department of Health, Education and Welfare within which OHMO lies] and the State of California, so that it can demonstrate its independent status . . . ." That same administrator told DOI officials in February 1978 that the absence of Blue Cross control of Health Net was assured because ". . . federal HMO regulations require a totally independent corporate status for Health Net." After some initial losses, Health Net began prospering and by 1982 earned its first profit resulting in a $60 million surplus.

While on the one hand manifesting to various agencies its lack of control of Health Net and asserting the latter's independence, Blue Cross on the

other hand took various actions which showed its intention to assert control over Health Net and benefit from its prosperity. Some of these actions were trivial, others substantial. For example, Blue Cross, without notice and by means of the service agreement it had with Health Net, changed Health Net's corporate stationery to read that Health Net was "an affiliate of Blue Cross" instead of "sponsored by Blue Cross." It also unilaterally ordered that any Health Net bank checks for an amount over $25,000 be approved and co-signed by a Blue Cross official. Because it collected the premiums from Health Net subscribers (by reason of the service agreement), Blue Cross had placed such funds in interest bearing accounts. Interest in the amount of almost $1 million was diverted from Health Net and never paid over.[10]

In early 1982, Health Net decided to reevaluate, restructure and reorganize itself in order to comply with then-recently enacted legislation. Effective in 1980, Corporations Code section 5310 had been amended to allow nonprofit corporations to eliminate members. (Stats. 1979, ch. 724, § 31, p. 2247.) By mid-1982, Blue Cross of California had been incorporated for the purpose of receiving the assets of Blue Cross of Northern California and Blue Cross of Southern California. Blue Cross of California was organized without corporate members. Section 11498 of the Insurance Code was amended to require that a nonprofit hospital service plan corporation's board of directors be at least two-thirds "public" members—up from one-half (Stats. 1982, ch. 1264, § 2, p. 4661). Health Net believed that unless some of its "providers" or other "non-public" directors were to resign, the company would have to expand the board from nine to thirteen in order to keep all of the then current directors on the board.

In December 1982, the Health Net executive committee directed its general counsel, Stephen Vogt, to draft proposed bylaw amendments in order to comply with the new legislation. Prior to the amendment, Greaves asked Blue Cross's president, Dan Smith, to join the Health Net board believing the recent restructuring of Blue Cross was an effort on Blue Cross's part to distance itself from Health Net. Smith declined the invitation believing his presence on the board would undermine Greaves's authority. In response, Greaves instructed Health Net's attorney, Vogt, to include in the proposed bylaw amendments a permanent "slot" for a Blue Cross representative hoping that representative would be Smith. That representative turned out

---

[10]Blue Cross rationalized the diversion by ascribing it to Blue Cross's right to be reimbursed for expenditures made during Health Net's infancy. However, the loan of money to Health Net was the subject of agreements which specified repayment schedules and notice for cancellation. This self-help procedure does not seem to have been authorized by any agreement or other document generated by or between Health Net and Blue Cross.

to be Raymond Finan, the executive vice president of Blue Cross of California. Prior to Finan's election as a Health Net director on June 14, 1983, Isadore Weinstein had been, since 1982, the only person to reside on both the Health Net and Blue Cross executive committees.

Vogt submitted three options to the Health Net executive committee in February 1983 in the form of a draft which showed the existing bylaws, with interlineations evidencing proposed additions, deletions and modifications. The three options were: (1) Health Net could have no members and 13 directors; (2) Blue Cross could continue appointing Health Net members, who, in turn, would appoint the 13 directors needed to ensure that two-thirds were representatives of the public; or (3) Blue Cross could be the sole member of Health Net and would directly appoint the 13 directors.

Following the February meeting, Health Net's president, Greaves, took Smith to lunch and told him of the bylaw amendments, including the fact that the option chosen would eliminate all corporate members of Health Net. He further advised Smith of the permanent slot for a Blue Cross representative and again asked Smith to serve on the board. Also, Smith accepted an invitation from Greaves to attend a future board meeting at which time the amendment was to be discussed.

On February 22, after reviewing the three options, the executive committee unanimously approved the option eliminating members. Attorney Vogt then notified Health Net directors of that action by a letter[11] containing

---

[11] The letter contained the following text: "As you will recall, the Board of Directors at its December 14, 1982 meeting directed staff and legal counsel to review the corporation's bylaws in light of recently enacted statutory changes and to make appropriate recommendations for amendments thereto.

"As a result, suggested modifications and available options were drafted by staff after consultation with legal counsel and were thereafter presented to the Executive Committee for review and action. The Committee has reviewed in-depth every section of the bylaws over the last several weeks and at a meeting held on February 22, 1983 approved a final revised set of bylaws to recommend for approval by the entire Board and the corporate members.

"Enclosed is the entire document approved by the Committee at the referenced meeting. It contains the existing bylaw provisions and the suggested revisions. The existing language is indicated via the use of strike-outs and the new language has been underlined.

"The revisions represent an attempt to address three separate issues (1) the recent enactment of AB2465 which changed the requirements for Board of Director composition for non-profit hospital service corporations (2) the recent changes made in connection with the legal structure of Blue Cross of Southern California, and (3) various 'clean-up' requirements based on statutory changes made to the California Nonprofit Corporations Code.

"Conceptually, there are only two major areas of changes which are contained in the revisions. The first involves the elimination of corporate members. At the time the original bylaws of Health Net were drafted and adopted, the California Nonprofit Corporations Code

another "redline" version of the bylaws eliminating the other two original options.

All of the director/members of Health Net, including Isadore Weinstein, who also sat on Blue Cross's executive committee, admitted receiving and reading this letter at least five days prior to a scheduled March 4, 1983, board meeting.[12] Each director understood that all corporate members were being eliminated; Blue Cross could no longer designate members; all rights formerly held by the members would vest in the directors if they eliminated the members; and the directors would thereafter elect themselves and their successors to the board.

In March 1983, Health Net's board met, reviewed, and approved the proposal. Following that meeting, Vogt sent Health Net corporate members a written form for them to memorialize their consent to the bylaw changes to which they had earlier agreed. The revised bylaws were attached as an exhibit. All members signed the consent form.

---

required that there be members of a corporation. That Code has subsequently been changed to allow corporations to exist without a membership body and to vest virtually all authority with the Board of Directors.

"After giving due consideration to whether or not to continue members of the corporation, the Executive Committee felt that the elimination of members would simplify the operational and administrative aspects of the corporation without materially modifying any existing relationships.

"Under the new proposed structure, the Board of Directors would have the power and responsibility for the election of Directors. Since historically the members of the corporation have also served as Directors, the same persons have always served in a dual capacity.

"The second major area of change involves the composition of the Board of Directors. As a result of statutory changes made to the Insurance Code in 1982, Health Net must comply with the requirement that at least 2/3 of its Board be representatives of the Public. This requirement was accommodated by the Executive Committee through the recommendation to increase the Board from the present nine members to thirteen members. The make-up of the Board would then be eight public representatives, three provider representatives, the President of Health Net and a representative of Blue Cross of California. This structure would therefore allow all existing Directors to remain in office, would assure representation of Blue Cross at all times, and would comply with applicable statutory requirements.

"The other suggested changes to the bylaws are relatively minor in impact and are in many cases required by new Corporation Code provisions.

"The Executive Committee has requested that each Director review the enclosed document in detail prior to the next Board meeting scheduled to take place . . . on March 4, 1983 and that action be taken at that meeting with respect to it's [sic] suggested amendments.

"If you should have any questions or wish clarification of any aspect of this matter prior to the Board meeting, please feel free to contact either myself . . . or Roger Greaves . . . ."

[12] Article IX of the corporate bylaws entitled "Amendments" provided that the bylaws could be amended by a majority vote of the members and the directors or by their "written assent" where ". . . notice of the proposed change was sent to all Members of the corporation at least five (5) days prior to the vote or the signing of a written instrument."

Blue Cross allegedly discovered the significance of the bylaw amendment one year later, in April 1984, when its counsel "reviewed Health Net's bylaws for another purpose and realized Blue Cross had been stripped of both its right to appoint members and its reversionary right to Health Net's assets." Blue Cross's president, Smith, protested to Health Net's president, Greaves, who agreed to "reinstate the asset reversion clause but not Blue Cross's right to appoint members. A proposal that Health Net's board select seven directors and Blue Cross the other six was accepted by Smith but later rejected after consultation with Blue Cross's counsel. Various unsuccessful negotiations followed.

Upon Health Net's refusal to revoke the bylaw amendments, Blue Cross appointed new members who purported to replace the existing Health Net board with new directors. This action forced Health Net to seek judicial intervention.

Following a trial on the merits, the court issued a 16-page statement of decision that concluded a permanent injunction was proper. In short, the court found that: Blue Cross had no vested legal entitlement to appoint Health Net's members; any such right was contrary to public policy when used by Blue Cross to perpetuate control of Health Net (Corp. Code, §§ 300, subd. (a), 5210); Health Net's bylaw amendments were valid, and that as a result, Health Net now had zero members under its Articles of Incorporation. Additionally, the court determined that the only rights Blue Cross had against Health Net were derived from written agreements between the two corporations, and that none of these writings encompassed or bestowed the vested right of member-appointment upon Blue Cross. Finally, the court dismissed any notion that Attorney Vogt's alleged breach of fiduciary duty to his former client (Blue Cross) could affect Health Net's otherwise proper bylaw amendments.

## DISCUSSION

Blue Cross asserts that "two pivotal deficiencies" of both fact and law in the trial court's decision resulted in reversible error. First, it insists the bylaw amendments were improper because they were not in harmony with the articles of incorporation, which take precedence. Second, Blue Cross argues that fiduciary duties owed to it were breached, because the notice provided to Health Net directors and members concerning the proposed bylaw changes was inadequate and was orchestrated by an attorney who had a conflict of interest. Neither argument has merit.

■ Upon review of a case in equity, "the well-settled standard of appellate review . . . requires the appellate court to 'view the facts in the light

most favorable to [the prevailing party below], giving [that party] the benefit of every reasonable inference and resolving all conflicts in [that party's] favor . . . .' (*Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 367 [131 Cal.Rptr. 78, 551 P.2d 398].)" (*Estate of Blanco* (1978) 86 Cal.App.3d 826, 831 [150 Cal.Rptr. 645, 6 A.L.R.4th 850].) ■ The granting of a permanent injunction is within the sound discretion of the trial court. The issuance of an injunctive decree is subject to reversal on appeal only if a clear abuse of discretion is evident. (*San Diego Union* v. *City Council* (1983) 146 Cal.App.3d 947, 952 [196 Cal.Rptr. 45].)

I

CONFLICT BETWEEN BYLAWS AND ARTICLES

■ The principal allegation of Blue Cross is that the deletion of the provision for members from Health Net's bylaws was impermissible. Blue Cross relies on several arguments to support its contention, and, as we shall see, none of these has merit. But one overriding legal fact mandates that the judgment below be affirmed. That fact is that Health Net was and is required to be an organization legally separate and independent from Blue Cross.

The trial court found: "Blue Cross . . . understood when Health Net was being qualified under State law as a public benefit, nonprofit corporation and under Federal HMO law that under the combination of those laws it had to be an independent, free-standing corporation which was not owned or controlled by any other company, and subject to controlling its own destiny . . . ."

Under federal law, an HMO such as Health Net had to establish and maintain an independent, legal existence in order to obtain certification. (42 U.S.C. § 300e; 42 C.F.R. § 110.108.) Presently, Insurance Code section 11498 provides that at least two-thirds of the board of directors of a nonprofit hospital service plan corporation, which Health Net is,[13] must be representatives of the public.

Corporate "members," as well as board directors, must owe their loyalty not to any "parent" corporation, but to their own organization, its charitable purposes, and its subscribers. That a nonprofit hospital service plan corporation may require in its infancy nourishment and direction from its parent (whether corporation, trust, or individual) is recognized in the law

---

[13] See footnote 2, *ante.*

governing such organizations. For example, Insurance Code section 11498, subdivision (c) provides that a board of directors of a nonprofit hospital service plan corporation which has less than 100,000 subscribers is exempt for a period of three years from the requirement that not less than two-thirds of the directors be representatives of the public.[14] The law thus contemplates that after the fledgling organization is in existence for three years or acquires over 100,000 subscribers, it no longer requires sustenance from its sponsors, and subordination is, as a matter of public policy, undesirable. Moreover, a corporation operating a nonprofit hospital service plan under Insurance Code section 11495 shall not "engage in any business other than that of establishing, maintaining and operating a nonprofit hospital service plan." (Ins. Code, § 11491.)

This concept of independence and self-control is implicitly recognized in the case of *Queen of Angels Hospital* v. *Younger* (1977) 66 Cal.App.3d 359 [136 Cal.Rptr. 36]. Among the questions examined in *Queen of Angels* was whether the resources of the corporation could be diverted to establish neighborhood outpatient clinics (which would eventually supplant the hospital operations) or to create a retirement fund for all members of the Roman Catholic religious order which was affiliated with the hospital organization. Since the principal charitable purpose for which the organization was incorporated was to operate a nonprofit hospital, this court answered each question in the negative. That ruling was made even though the organization's articles of incorporation also provided for purposes and activities consistent with the operation of outpatient clinics and even though many of the sisters of the religious order had provided significant services to the hospital. (*Id.* at pp. 369-373.)

---

[14] Subdivision (c) of Insurance Code section 11498 reads in its entirety as follows: "A board of directors of a nonprofit hospital service plan corporation which has less than 100,000 subscribers and is in existence prior to January 1, 1983, but not in existence for a period longer than a total of five years prior to January 1, 1983, shall be exempt from the board composition requirements as stipulated in subdivision (a) for a period of three years commencing January 1, 1983, or until the subscriber population of the corporation exceeds 100,000 as filed with and verified by the commissioner. [¶] A nonprofit hospital service plan corporation formed after January 1, 1983, which has less than 100,000 subscribers, shall be excluded from the board composition requirements provided for in subdivision (a) for a period of three years from the date of its formation or until the subscriber population of the corporation exceeds 100,000 as filed with and verified by the commissioner. [¶] A corporation presently operating under this chapter shall not be required to comply with the amendments to this section enacted at the 1973-74 Regular Session of the Legislature, if such compliance would require the resignation of any person duly appointed or elected as a director of such corporation at the time such amendments become effective; provided, however, that after such amendments become effective, no person shall be appointed, elected, reappointed or reelected as a director of such corporation if such appointment, election, reappointment or reelection would be in violation of this section. This exemption shall not be applicable to any corporation operating under this chapter after January 1, 1977."

The Health Net bylaw provision permitting Blue Cross to appoint the Health Net corporate members is inconsistent with this principle of independence and Health Net could properly eliminate it. Since 1980, the Nonprofit Public Benefit Corporations Law has permitted such a corporation to have no "members" at all. (Corp. Code, § 5310.)[15] Modification or elimination of membership is permissible when fair, reasonable, and statutorily approved methods are followed. (See *Ferry* v. *San Diego Museum of Art* (1986) 180 Cal.App.3d 35, 40-46 [225 Cal.Rptr. 258]; see also Corp. Code, § 5342.)[16]

■ At the heart of the Blue Cross argument lies the conflict between the articles and the bylaws as amended. Those articles provide that the bylaws set forth merely the number and qualifications of the corporation members.[17] No Blue Cross privileges regarding designation of members are recited in the articles. Health Net amended its bylaws to provide that there would be no members at all. The answer of Health Net, and the trial court as well, is that "zero is a number" and, hence, there is no conflict. While for some purposes zero may be a number, in this context it connotes the difference between some and none, the existence or nonexistence of the controlling element of the corporation. Such a difference is one of nature or kind rather than quantity. Thus, such resolution of this issue is unsatisfactory.

■ In stressing apparent conflict between the articles and the bylaws, Blue Cross relies on Corporations Code section 5151, subdivision (c). That provision states that "bylaws may contain any provision not in conflict with law or the articles." However, the articles do not mandate Blue Cross selection of members and merely leave it for the bylaws to specify all significant criteria and procedures concerning members. More importantly,

---

[15] Section 5310 provides in pertinent part: "(a) A corporation may admit persons to membership, as provided in its articles or bylaws, or may provide in its articles or bylaws that it shall have no members. In the absence of any provision in its articles or bylaws providing for members, a corporation shall have no members.

"(b) In the case of a corporation which has no members, any action for which there is no specific provision of this part applicable to a corporation which has no members and which would otherwise require approval by a majority of all members (Section 5033) or approval by the members (Section 5034) shall require only approval of the board, any provision of this part or the articles or bylaws to the contrary notwithstanding.

"(c) Reference in this part to a corporation which has no members includes a corporation in which the directors are the only members."

[16] Neither Corporations Code section 5342, which governs amendment of articles or bylaws terminating memberships, nor a Health Net bylaw article providing for amendment of the bylaws (Article IX, Amendments) are cited on this appeal by the parties as justifying or invalidating the Health Net amendment of its bylaws.

[17] See footnote 7, *ante.*

it appears that there previously existed a conflict between the bylaws and the law, a conflict also prohibited by section 5151, subdivision (c). As previously described, the combination of federal and state law applicable to Health Net does not permit control of Health Net by an outside agency such as Blue Cross. Thus, even if there is conflict between the articles and the present bylaws, the resolution of that conflict cannot be the dismantling of Health Net or the restoration of a bylaw provision which allows Blue Cross to appoint members and thus to thwart the legal requirement that Health Net operate independently. We find, therefore, that the original bylaw provision was unlawful as applied and that it was proper to eliminate it.

Moreover, the provision in the articles may reasonably be read to mean that, to the extent that the law requires the corporation to have members (which it did at the time Health Net was formed), the bylaws must provide for their number and qualifications. Indeed, article VI of the articles, quoted above, appears to have been copied directly from the then existing language of the Corporations Code.[18] As previously discussed, by the time the bylaws were amended the Corporations Code no longer required members. With the amendment of the bylaws in conformity with the change in the law, the provision in the articles for members could be viewed as surplusage.

The authority of Health Net to amend its own bylaws as it did is also consistent with the independent status which Blue Cross itself described to regulatory agencies. It is also consistent with the written service and loan agreements entered into between Blue Cross and Health Net. Those instruments, rather than the articles and bylaws, represent and safeguard such vested rights as Blue Cross may have. The most significant of these is to have its cash advances repaid with interest.

None of these agreements purports to give Blue Cross an enduring power of appointment of Health Net members.[19] In fact, the agreements compel the conclusion that no perpetual right of control through the appointment power was reserved, assuming such were lawful. The service agreement, for

---

[18] Blue Cross concedes this point in its appellate brief. In 1977, Corporations Code section 9301 provided in pertinent part as follows: "The authorized number and qualifications of members of the corporation, the different classes of membership, if any, the property, voting, and other rights and privileges of members, and their liability to dues or assessments and the method of collection thereof, shall be set forth either in the articles or in the by-laws . . . ."

[19] Notwithstanding the requirement of legal independence of Health Net from Blue Cross and Blue Cross's assertions to the regulatory authorities that Health Net was separate and independent, Blue Cross treated Health Net as if it were part of Blue Cross by including it in its annual financial statements and diverting nearly $1 million of Health Net funds.

example, under the heading of "Health Net Autonomy," stated: "Nothing herein contained shall vest in Blue Cross of Southern California any control over the management of the affairs of Health Net or the [health care] Plan."

In a November 1977 application to OHMO, Blue Cross described "the relationship between Health Net and Blue Cross . . . ." The accompanying documentation consisted of the previously mentioned financial and service agreements. The application states that Health Net "is an independent legal entity organized under the IIA Section [*sic*; Chapter 11A] of the California Insurance Code." It further states that Blue Cross "sponsored the development of Health Net and currently functions as a Health Net contractor via Health Net/Blue Cross service and financial agreements" and also as "a reinsurer of Health Net by providing protection to Health Net enrollees for out of area emergency care and care in access [*sic*] of $5,000 per year per enrollee." The application concludes with this statement: "Health Net is directed by an independent Board of Directors and managed by individuals employed by Health Net. Blue Cross['s] . . . sponsorship role of Health Net is to help facilitate Health Net's growth and help assure its financial and organizational stability." Nothing in the application suggests that Blue Cross was retaining the right to control Health Net through a members-appointing power.

Similarly, in an application for recognition of an exemption which was also submitted to OHMO, Blue Cross cited as its connection with Health Net only the financial and service agreements. Again the bylaw provision was never mentioned.

The federal and state agencies which awarded HMO and nonprofit hospital service plan status to Health Net reasonably relied on these Blue Cross representations as did Health Net itself in making its applications and conducting its business. Hence, by virtue of these representations, Blue Cross is estopped from asserting any right of control over Health Net. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 869 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ Simply stated, the object of the Blue Cross action in reconstituting the Health Net members and board was obviously to perpetuate Blue Cross control of its offspring. Blue Cross clearly could not have that authority. Blue Cross recognized this fact when it represented to the regulatory agencies that Health Net was separate and independent. Blue Cross cannot have it both ways. The trial court's resolution of this dispute by upholding Health Net's deletion of the Blue Cross appointment power was a proper exercise of the trial court's equitable discretion.

## II

### BREACH OF FIDUCIARY DUTY

 Blue Cross further argues that Health Net has unclean hands and is barred from equitable relief. The argument rests on assertions that Health Net and its counsel, Stephen Vogt, breached sundry fiduciary duties owed to Blue Cross. We initially note that such issue is best left to the trial court sitting as chancellor in equity unless manifest abuse is shown in the decision. (See *Bennett* v. *Lew* (1984) 151 Cal.App.3d 1177, 1187 [199 Cal.Rptr. 241]; 7 Witkin, Summary of Cal. Law (8th ed. 1974) § 8, p. 5234.)

Thus, as a general rule, the application of the doctrine of unclean hands is primarily a question of fact. (*Insurance Co. of North America* v. *Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306 [180 Cal.Rptr. 244].) This doctrine is usually associated with the rule of law which precludes a grantor from recovering his property from a grantee when the conveyance is deemed a fraudulent one. (*Estate of Blanco, supra,* 86 Cal.App.3d 826, 831.) In other contexts, equity may also refuse relief to a plaintiff who does not come into court with clean hands. The doctrine is, however, not necessarily " '. . . a complete defense. It is well settled that public policy may favor the nonapplication of the doctrine as well as its application.' (*Radich* v. *Kruly* (1964) 226 Cal.App.2d 683, 686 [38 Cal.Rptr. 340].) 'Whenever an inequitable result would be accomplished by the application of the "clean hands" doctrine the courts have not hesitated to reject it.' (*Womack* v. *Womack* (1966) 242 Cal.App.2d 572, 579 [51 Cal.Rptr. 668].)" (*Id.* at p. 833.)

 The trial court's implicit finding that Health Net was not barred from equitable relief was adequately supported by the facts presented below. No abuse is manifested in this record.

The basic premise of the Blue Cross argument is that Health Net officials had a duty to perpetuate the Blue Cross power to appoint members. There was no such duty.

The ancillary argument is that Health Net violated a duty it owed to Blue Cross to more fully disclose the nature of the bylaws amendment and its effect upon the relationship of the two organizations. However, substantial evidence supports the trial court's finding that there had been full disclosure to all directors and corporate members and to Blue Cross as well.

The record demonstrates that all Health Net board members, including the Blue Cross representative, Isadore Weinstein, were adequately informed

of the consequences of the proposed amendment of the bylaws. The record does not establish any evidence contrary to the court's finding that Health Net's attorney, Vogt, did not misrepresent or omit material facts to the members.[20] When read in context, Vogt's letters to the directors advised them that choosing the option eliminating members would in fact eliminate corporate members. Logically, this change would effectively eliminate the right of Blue Cross, the sole appointer of members, to appoint them. The Health Net members assenting to the elimination of their offices were hardly ignorant about the corollary deletion of the Blue Cross appointment power inasmuch as they themselves had been appointed by Blue Cross.

Blue Cross also contends that Vogt failed to point out that his drafted bylaw amendments would delete the provision that Health Net's assets would go to Blue Cross in the event of a Health Net dissolution. Our answer to the question is simple: Blue Cross has no enforceable right to such a provision in Health Net's bylaws, unless it can point to a contractual obligation that requires Health Net to maintain such a reversionary clause in its bylaws. No such contractual requirement has been cited nor do we discern such in the record. In any event, evidence in the court below indicated that both the deletion and the omission of notice may have been an oversight. At a later time, Health Net offered to restore that provision.[21]

 Blue Cross also maintains that Attorney Vogt betrayed his obligations and duties owed to Blue Cross as his client or former client. The relationship between an attorney and client creates a fiduciary relationship of the highest character. (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 189 [98 Cal.Rptr. 837, 491 P.2d 421].) Certain rules of professional conduct pertinent to California lawyers require "full and fair disclosure to the [client] of all facts which materially affect his rights and interests." (*Ibid.*)[22] But it appears from this record that,

---

[20] Among the alleged misrepresentations cited by Blue Cross has been the partial sentence in Vogt's February 1983 letter to the directors (see fn. 11, *ante*) which reads as follows: "The other suggested changes to the bylaws are relatively minor in impact . . . ." In retrospect this assessment does not appear accurate. However, evidence at trial suggested that it may have been written in good faith. Prior to 1983, the corporate members had been generally appointed from names provided by Health Net. Moreover, subsequent to the change in the Corporations Code, Blue Cross had itself eliminated members. Finally, Health Net officials had come to feel that Blue Cross was attempting to distance itself from Health Net. Thus, Vogt had reason prior to the growth of the instant controversy to assess the changes as "relatively minor."

[21] Blue Cross conceded in the trial court that its legal rights regarding the reversionary interest were not at issue except insofar as they related to the adequacy of Vogt's notice and advice to Health Net's corporate members and directors.

[22] Rule 4-101 of the Rules of Professional Conduct provides: "A member of the State Bar shall not accept employment adverse to a client or former client, without the informed and

at the time Vogt advised the Health Net directors, he was no longer providing legal assistance to Blue Cross relative to Health Net and that Blue Cross officials were aware of that fact.

██ Yet even if we were to assume that Vogt was acting in a dual capacity, such representation is not barred per se. (*Day* v. *Rosenthal* (1985) 170 Cal.App.3d 1125, 1148-1149 [217 Cal.Rptr. 89].)[23] Cases relied upon by appellant are not on point. For example, in *Pennix* v. *Winton* (1943) 61 Cal.App.2d 761 [143 P.2d 940], a negligence suit in which the defendant was insured, defense counsel in attacking plaintiff seemed to be representing the insurance company at the expense of his client. He assailed both plaintiff and defendant, his own client, accusing them of collusion and other nefarious deeds. Since this unethical trial tactic in fact harmed the defendant's case, the misconduct was grounds for a reversal of the judgment. No such conduct on the part of Attorney Vogt is shown by this record. ██ The duty to terminate the attorney-client relationship may arise whenever counsel for a party to an action has reason to believe that discharge of his duties to that party will conflict with discharge of his duties to a third party. (*Hammett* v. *McIntyre* (1952) 114 Cal.App.2d 148, 153 [249 P.2d 885].) The same duty arises where an attorney is faced with the situation of representing inconsistent claims of two parties because he must be capable of devoting his entire energies in his client's interests and on his client's behalf. (*Id.* at p. 156.) ██ These precise situations did not arise in this case, because Vogt no longer represented Blue Cross concerning Health Net nor had any lingering duty in that respect.

Here, Blue Cross was obviously aware of Vogt's efforts on behalf of Health Net and Health Net was aware of Vogt's previous relationship with Blue Cross. The Blue Cross representative, Weinstein, was privy to the same information the other directors received concerning the prospective board actions. Hence, there was no breach of fiduciary duty by reason of a failure to disclose any conflicting relationships.

---

written consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

Rule 5-102(A) provides: "A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment. . . ."

Rule 5-102(B) provides: "A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

[23] "Dual representation . . . is permitted . . . where disclosure is sufficient to 'enable [the] client to make free and intelligent decisions regarding the subject matter of the representation.' " (*Day* v. *Rosenthal, supra,* 170 Cal.App.3d 1125, 1148-1149, quoting *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 147 [65 Cal.Rptr. 406, 28 A.L.R.3d 368].) The record, however, indicates that Vogt merely continued to provide legal services to Blue Cross relating to "bad faith" litigation.

There are additional defects in the Blue Cross position. First, it was Blue Cross which placed Vogt in a position to act as attorney for Health Net, a position clearly fraught with a potential for conflict of interest. Secondly, once Vogt became legal counsel to Health Net (as well as corporate secretary), his general loyalty was owed to the latter, not to Blue Cross. There simply was no conflict of interest at that point unless he used confidential information he had obtained as attorney for Blue Cross to the detriment of the latter organization and to the advantage of Health Net or unless he represented Health Net in a matter about which he had previously represented Blue Cross. The latter is absolutely not shown, and Blue Cross advances only vague suggestions about the former.

Moreover, under the circumstances in this case, as we have indicated, Blue Cross had no vested interest in Health Net to appoint its members. Thus, Vogt was not acting adversely to Blue Cross by helping Health Net amend its bylaws. Even if that act was considered adverse representation, as Blue Cross claims on this appeal, Vogt's representation was fully disclosed to Blue Cross, and Blue Cross may not now complain of it.

■ There are exceptions to the general rule that an attorney may not do anything which will injure his former client in any matter in which he formally represented him and may not at any time use against his former client knowledge or information acquired by virtue of the previous relationship. An exception may exist, where the new employment is not inconsistent with the former employment or where the client expressly or impliedly consents to the adverse representation. (*Ward* v. *Superior Court* (1977) 70 Cal.App.3d 23, 31 [138 Cal.Rptr. 532].)

■ Although a waiver of an objection to an opposing attorney by reason of a disqualifying conflict of interest will normally not be presumed merely because of delay in raising such objection, a client or former client may consent to an attorney's acceptance of adverse employment and such consent may be implied by conduct. (*River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1305-1313 [234 Cal.Rptr. 33]; see also *People* v. *Johnson* (1980) 105 Cal.App.3d 884, 892 [164 Cal.Rptr. 746].) Such consent constitutes a waiver of the right to object. ■ Since Blue Cross provided Vogt to Health Net to act as the new corporation's counsel, Blue Cross implicitly consented to any adverse representation and may not now complain because of it.

■ In any event, even if some conflict can be made out, the remedy of Blue Cross was to sue Vogt for any breach of duty on his part. Blue Cross did not prove any conspiracy that might afford relief against Health Net as

well. Thus, this Blue Cross allegation may not be used collaterally to defeat Health Net's amendment of its own bylaws.

We therefore hold that, in resolving these issues, the trial court did not abuse its discretion by granting Health Net equitable relief and prohibiting Blue Cross from interference in Health Net's corporate operation.

## DISPOSITION

The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied October 12, 1988.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.