Filed 12/20/18

<u>**CERTIFIED FOR PUBLICATION**</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANTELOPE VALLEY GROUNDWATER CASES | F078517 |
| ANTELOPE VALLEY—EAST KERN WATER AGENCY, | (Super. Ct. No. BC325201) |
| Cross-complainant and Appellant, | (JCCP No. 4408) |
| v. | |
| LOS ANGELES COUNTY WATERWORKS DISTRICT NO. 40, | **OPINION** |
| Cross-defendant and Respondent. | |
| [And seven other cases.]* | |

APPEAL from an order of the Superior Court of Los Angeles.  Jack Komar,† Judge.

Banks & Watson and James J. Banks for Cross-complainant and Appellant Antelope Valley—East Kern Water Agency.

---

*_Los Angeles County Waterworks District No. 40 v. Diamond Farming Co._ (L.A. Super. Ct. No. BC325201); _Los Angeles County Waterworks District No. 40 v. Diamond Farming Co._ (Kern Super. Ct. No. S-1500-CV254348); _Wm. Bolthouse Farms, Inc. v. City of Lancaster_ (Riverside Super. Ct. No. RIC353840); _Diamond Farming Co. v. City of Lancaster_ (Riverside Super. Ct. No. RIC344436); _Diamond Farming Co. v. Palmdale Water Dist._ (Riverside Super. Ct. No. RIC344668); _Willis v. Los Angeles County Waterworks District No. 40_ (L.A. Super. Ct. No. BC364553); _Wood v. Los Angeles County Water Works District No. 40_ (L.A. Super. Ct. No. BC391869).

†Retired judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Mary Wickham, County Counsel, Warren R. Wellen, Deputy County Counsel; Best Best & Krieger, Eric L. Garner, Jeffrey V. Dunn, Wendy Y. Wang; Greines, Martin, Stein & Richland, and Timothy T. Coates for Cross-defendant and Respondent Los Angeles County Waterworks District No. 40.

-ooOoo-

Nearly 20 years ago, the first of numerous lawsuits was filed which ultimately became this consolidated proceeding known as the Antelope Valley Groundwater Adjudication (AVGA) cases. In 2004, lawyers with the law offices of Best, Best & Krieger, LLP (BB&K), who were representing another public entity interested in the AVGA cases, were asked to also undertake prosecuting the interests of respondent Los Angeles County Water District No. 40 (District No. 40). BB&K agreed and began representing District No. 40 in 2004 and has continued in that role to the present time.

Appellant Antelope Valley—East Kern Water Agency (AVEK)[1] was not a named party in any of the lawsuits in the early years. AVEK had an existing relationship with BB&K: AVEK had retained BB&K in 1987 to act as AVEK's general counsel, and Michael Riddell, a member of BB&K, acted as general counsel for AVEK from 1987 until January 2016.

Approximately two years after BB&K began representing District No. 40, AVEK became enmeshed in the AVGA cases. AVEK retained separate attorneys to protect its interests in that litigation. Ten years later, after the bulk of the AVGA litigation was completed, AVEK decided to terminate BB&K as its general counsel and, for the first time, demanded that BB&K voluntarily recuse itself from further representing District No. 40 in the AVGA cases. BB&K declined AVEK's demand and, six months later, AVEK filed its motion seeking an order disqualifying BB&K from further representing either District No. 40 or any other party to the AVGA cases. The trial court denied the motion, and the present appeal challenges the order denying the motion.

---

[1]Misidentified on appeal as Antelope Valley East—Kern Water Agency.

AVEK's argument appears to contend the absence of a *written* consent by AVEK to BB&K's representation of District No. 40 is dispositive, and the trial court erred in considering any circumstances beyond that single fact when it evaluated AVEK's motion. From that predicate, AVEK argues automatic disqualification of BB&K from further representation of District No. 40 was mandatory, and reversal is therefore required.

We conclude there was substantial evidence to support the trial court's conclusion AVEK effectively consented to BB&K's representation of District No. 40, and its inordinate delay in seeking disqualification estops AVEK from seeking to disqualify District No. 40's chosen counsel.

## I.

## FACTUAL BACKGROUND[2]

The AVGA cases began with lawsuits filed commencing in 1999; the lawsuits named numerous public water suppliers as defendants, including Rosamond Community Services District (RCSD) and District No. 40. AVEK was not named as a defendant in the early years because AVEK is not a public water supplier. AVEK instead is a state water contractor that wholesales state project water to public water suppliers, such as District No. 40, and to a small number of private landowners for their agricultural or industrial operations.

***The Simultaneous Representation from 2004 to 2016***

BB&K attorneys Eric Garner and Jeffrey Dunn served as counsel to RCSD when the initial lawsuits were filed. BB&K attorney Michael Riddell served as AVEK's

---

[2]The parties do not dispute that, when reviewing a trial court's ruling on a motion to disqualify counsel, we must defer to any factual determinations made by the trial court if they are supported by substantial evidence. (*Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860; *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585.) Accordingly, our factual recitation examines the facts in the light most favorable to the trial court's ruling to the extent those express or implied factual determinations are supported by substantial evidence. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 (*SpeeDee Oil*); *People v. Jenkins* (2000) 22 Cal.4th 900, 969.)

general counsel.  AVEK was not involved in the AVGA cases in those early years. District No. 40, the largest of the Antelope Valley public water suppliers, was represented by another law firm in the early years of the AVGA cases.

A "phase 1" trial began in late 2002 seeking to determine the geographic boundary for the parties' respective groundwater rights claims, but the trial was not completed. Instead, the matters were eventually sent to mediation.  However, the mediator determined it would be necessary to have a basin-wide adjudication to achieve a physical solution to the basin's overdraft problem and to resolve all parties' groundwater claims to the basin, some of whom had not yet been joined in the litigation.  District No. 40 then approached Dunn and Garner about potentially representing District No. 40 in the AVGA cases.  After RCSD agreed to have BB&K represent both itself and District No. 40, BB&K filed adjudication complaints in late 2004 on behalf of both District No. 40 and RCSD for declaratory and injunctive relief.  Among other things, the complaints alleged District No. 40 and RCSD had pumped water from the basin and thereby acquired prescriptive water rights as against private property owners in the basin, and it sought a physical solution to the basin's overdraft condition, including a comprehensive adjudication of groundwater rights.

District No. 40's 2004 adjudication complaints did not name AVEK as a party.[3] Riddell advised AVEK of the adjudication complaints shortly before they were filed. Riddell advised AVEK that, while District No. 40 did not intend to name AVEK, it was possible another party to the litigation might file a cross-complaint naming AVEK as a cross-defendant, even though AVEK had never pumped water from the basin nor claimed

_____

[3]Neither District No. 40's adjudication complaints nor the initial complaints instigating the AVGA cases named AVEK because it is a State Water Project wholesaler and a public entity not subject to a claim of prescriptive rights.  Additionally, AVEK's written agreement with District No. 40's predecessors in interest, which recognized that "groundwater supplies within [AVEK] are seriously depleted," provided that if there was an adjudication involving the groundwater basin, AVEK would assist District No. 40 in retaining District No. 40's rights in the groundwater supply.

4.

any right to water in the basin. However, cautioned Riddell, if AVEK were brought into the litigation by another party, BB&K would need a "conflict waiver" before it could appear on AVEK's behalf in the litigation because BB&K was then representing other parties in the action.

By the end of 2005, the Judicial Council had entered its order requiring all pending actions (including the originally filed lawsuits and District No. 40's adjudication complaints) be coordinated. The coordinated AVGA cases were then assigned to the Honorable Jack Komar, judge of the Santa Clara County Superior Court. In a cross-complaint in the coordinated proceedings filed in early 2006, District No. 40 (along with the other public water suppliers) alleged that (1) they imported water into the basin via purchases from the State Water Project, (2) they had the right to store such imported water in the basin, and (3) they had the sole right to pump or use such stored State Water Project water as against the named cross-defendants. The public water suppliers also alleged some of the imported State Water Project water returned to or entered the basin as "return flows," which further augmented the basin's water supply. They further alleged they had the sole right to "recapture" any return flows attributable to such imported State Water Project water as against the named cross-defendants. AVEK was not named as a cross-defendant in this cross-complaint.

At some point thereafter, AVEK *was* named as a cross-defendant in one of the coordinated actions by another party.[4] By late February 2006, AVEK had retained the law firm of Brunick, McElhaney & Kennedy (Brunick) to represent AVEK in the AVGA cases, although AVEK decided to keep BB&K as counsel on other matters unrelated to the AVGA cases.[5] Various parties thereafter filed a series of cross-complaints, and in

---

[4]The record in this appeal does not reflect when, or by whom, AVEK was brought into this proceeding.

[5]In 2006, AVEK also made the decision to use Brunick for AVEK's public meetings, replacing BB&K attorney Riddell. Brunick served in that capacity while also representing AVEK in the adjudication proceedings until 2009, at which point AVEK returned to the BB&K

late August 2006 AVEK (through its Brunick attorneys) filed its own cross-complaint, which included District No. 40 as a cross-defendant. AVEK asserted it imported State Water Project water into the basin, had the right to store such imported water in the basin, and had the sole right to pump or use such stored State Water Project water as against the named cross-defendants. AVEK also alleged some of the imported State Water Project water returned to or entered the basin as return flows, which further augmented the basin's water supply. As primary importer of water creating such return flows, AVEK alleged it had the sole right to recapture any return flows attributable to such imported State Water Project water.

During the decade of litigation spanning early 2006 and through the entry of judgment at the end of 2015, BB&K represented District No. 40 and Brunick represented AVEK in the AVGA litigation. During this period, the court conducted numerous phases to resolve the competing claims of all of the parties claiming an interest in the basin's groundwater, and BB&K was the primary counsel shepherding the litigation for the public entities.[6] At no point did AVEK manifest any objection to BB&K's simultaneous

attorney Riddell to represent AVEK in public meetings, while keeping Brunick as its counsel in the adjudication proceedings.

[6] For example, in phase 1 of the trial (conducted in 2006) to determine the basin boundaries, BB&K was primarily involved with the presentation of evidence in that phase. In phase 2 of the trial in late 2008, which tested various parties' claims they should be excluded from the adjudication proceedings because their interests were in areas not hydro-geologically connected to the basin, BB&K was primarily involved in defending against such claims. In phase 3 of the trial, which evaluated the basin's "safe yield" and tested the claim (asserted by both District No. 40 and AVEK) that the basin was and remained in an overdraft condition, the parties engaged in extensive discovery over a two-year period. At the early 2011 trial on this issue, BB&K was primarily involved with presenting evidence in support of the joint claims raised by District No. 40 and AVEK. The three years thereafter involved numerous court appearances as well as extensive mediation and settlement discussions that were unsuccessful. The court ultimately scheduled and conducted a phase 4 trial to adjudicate the ground water use for hundreds of involved parties. BB&K undertook the time-consuming and expensive responsibility of assimilating and analyzing the data submitted by the parties (as well as the extensive engineering analysis and satellite imaging review of actual land use over time), and BB&K's efforts permitted an expedited evidentiary presentation for the phase 4 trial conducted in 2013.

6.

representation of both District No. 40  (in the AVGA cases) and AVEK (as general counsel on unrelated matters).  Indeed, AVEK's acceptance of this simultaneous representation continued unabated throughout the entire litigation even though AVEK on occasion posited claims inconsistent with those of District No. 40.[7]  The trial on phase 5, which planned to encompass (among other things) resolution of the return flow claims for those parties asserting such claims (including AVEK and District No. 40), commenced in February 2014.  However, shortly after trial commenced, Brunick (on behalf of AVEK) and BB&K (on behalf of District No. 40) informed the court that AVEK and District No. 40 had reached a tentative settlement of their issues *inter se*, which they thought could lead to resolution of all claims in the case.  The trial court suspended the phase 5 trial and directed the parties to conduct immediate settlement negotiations.

Those settlement negotiations ultimately produced a global settlement agreement encompassing nearly all the remaining claims.[8]  In early 2015, both District No. 40 and AVEK approved the proposed settlement agreement,  which included a resolution of all groundwater disputes between AVEK and District No. 40.  During the latter half of 2015, the trial court conducted various hearings concerning the proposed written settlement,

---

[7]Although the trial court noted that "District 40 and AVEK were on the same side of virtually every issue in the case," it also noted AVEK was "well aware" its interests were not necessarily in complete lockstep with District No. 40.  For example, in 2011, shortly after the trial court had preliminarily approved a settlement on behalf of a group known as the "Willis class," attorneys for that group moved for attorney fees under Code of Civil Procedure section 1021.5.  District No. 40 opposed that motion but argued (in the alternative) that any fee award should be "apportioned" among other AVGA parties who pump water from the basin based on a pro rata share of their pumping.  AVEK opposed the "apportionment" argument.  Nevertheless, even after this actual rift between AVEK and District No. 40 surfaced, AVEK did not object to BB&K's concurrent representation of District No. 40 and AVEK.  Moreover, in 2013, AVEK sought a finding (by summary adjudication motion) that it alone had the right to return flows from the State Water Project water and District No. 40 had no right to such return flows.  BB&K (on behalf of District No. 40) opposed and successfully defeated AVEK's summary adjudication motion.  Nevertheless, AVEK still remained silent on BB&K's simultaneous representation of District No. 40 and AVEK for another two years.

[8]The proposed written settlement was acceptable to all parties except Phelan Piñon Hills Community Service District and a small group of landowners.

receiving evidence from both settling and nonsettling parties, and in November 2015 the trial court approved the physical solution for the basin, including approval of the parties' settlement agreement. On December 28, 2015, the trial court entered a final judgment in the adjudication, thus ending years of trial court litigation of the matter.

During the decade of litigation in which BB&K represented AVEK and District No. 40, AVEK never asserted BB&K could not simultaneously represent District No. 40 in the AVGA cases while providing counsel to AVEK on other matters.

### The Post-judgment Disqualification Motion in 2016

Approximately one month after the court entered judgment, AVEK terminated its legal services agreement with BB&K. Shortly thereafter, AVEK sent a letter to BB&K demanding that it stop representing District No. 40 in the AVGA litigation. For the first time in more than 10 years of concurrent representation, AVEK asserted BB&K had a conflict of interest which required its immediate disqualification from representing District No. 40. Seven months later, AVEK filed its motion to disqualify BB&K. AVEK argued BB&K had concurrently represented parties with potential or actual conflicting interests without AVEK's written consent and that this required automatic disqualification of BB&K from any further representation of District No. 40.

District No. 40 opposed the motion, noting the question of whether to disqualify counsel rests on equitable principles and equity compelled denial of the motion under all of the relevant circumstances. These circumstances included that (1) AVEK delayed a decade before raising the issue, (2) District No. 40's interests (as well as the interest of the other parties and the court) would be compromised if BB&K were disqualified at this late date, (3) BB&K had received no confidential information from AVEK concerning the AVGA litigation, and (4) BB&K was no longer counsel for AVEK in any matter.

The matter was heard by Judge Komar, who had presided over this matter since the 2005 coordination order. The court, citing *Flatt v. Superior Court* (1994) 9 Cal.4th 275 (*Flatt*), acknowledged that simultaneous representation of parties with adverse

interests, if promptly objected to, almost always requires automatic disqualification. The court also recognized, however, the *Flatt* caveat that the clients (for whose benefit the rule against such simultaneous representation exists) can agree to waive that conflict. The court also noted, citing *SpeeDee Oil*, *supra*, 20 Cal.4th 1135, that a motion to disqualify counsel is a motion in equity and requires consideration of numerous factors, including a client's right to counsel of its choice, an attorney's interest in representing a client, the financial burden on the client to replace counsel, and interests beyond the interest of the parties. The court further observed delay in raising a disqualification issue was relevant to determining whether disqualification was appropriate.

With these principles of governing law in mind, the court specifically found:

(1) When District No. 40 initially retained BB&K, there was no actual conflict and AVEK publicly stated it was maintaining a neutral stance on the issues. However, an actual conflict of interest did arise when AVEK, in response to being sued by a third party, named District No. 40 in AVEK's cross-complaint (although District No. 40 did not countersue AVEK) and claimed return flow rights to water sold to parties such as District No. 40. From this point and for the ensuing decade, AVEK was represented by separate counsel in the AVGA litigation, and BB&K never represented AVEK in connection with the AVGA litigation.

(2) During the AVGA litigation, and notwithstanding the cross-complaint, AVEK acted cooperatively with District No. 40 and was on the same side of virtually every issue, with the sole exceptions of (a) whether to apportion to AVEK any part of the attorney fees and costs sought by the Willis and Wood classes attorneys, and (b) whether AVEK was entitled to return flows from District No. 40's and other public water producers' retail customers' water use.

(3) All claims (apart from several claims of small nonsettling landowners) were settled by a written agreement, stipulation, and judgment, approved by the court on December 23, 2015, and this settlement and judgment resolved the conflicts between

9.

AVEK and District No. 40 over apportioning class attorney fees and the return flow rights. It was only after the judgment was entered and all issues were resolved that AVEK terminated and sought to disqualify BB&K.

(4) BB&K's concurrent representation of AVEK and District No. 40 ended almost one year earlier. There was no evidence BB&K acquired or used any confidential information from AVEK germane to the AVGA in the litigation or that Riddell has provided any confidential information to District No. 40 or its legal team.

Based upon these findings, the court concluded AVEK impliedly consented to BB&K's representation of District No. 40 throughout the 10-plus years of litigation. Because AVEK knew of the conflict but elected to take no action until after the judgment had been entered, the motion was also deemed "untimely and extremely prejudicial to District 40 and to the court system." The court found disqualification would serve no useful purpose and would instead harm all parties who support the stipulation for judgment and the physical solution approved by the court, and the unique facts here justified departing from the rote application of the per se disqualification rule ordinarily applicable to concurrent conflicts cases. Accordingly, the court denied AVEK's motion to disqualify BB&K from continuing to represent District No. 40. AVEK timely appealed from that order.

## II.

## LEGAL ANALYSIS

### A. Standard of Review

A trial court's decision on a disqualification motion is ordinarily reviewed for abuse of discretion. (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1143; *Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.*, *supra*, 68 Cal.App.4th at p. 860.) When a trial court's ruling rests on its resolution of disputed factual issues, "the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the

10.

trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.]" (*SpeeDee Oil*, *supra*, at pp. 1143–1144.)

The deference we accord to the court's factual findings extends not only to its express findings but also to any implicit findings for which there is substantial evidentiary support. (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1143; *Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.*, *supra*, 68 Cal.App.4th at p. 860 ["even where there are no express findings, we must review the trial court's exercise of discretion based on implied findings that are supported by substantial evidence"]; *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1110.) The abuse of discretion standard requires that we affirm the ruling unless "there is no reasonable basis for the trial court's decision." (*Federal Home Loan Mortgage Corp.*, *supra*, at p. 860.)

A trial court's discretion is of course limited by the applicable legal principles, and the courts also recognize "a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1144; see *In re Complex Asbestos Litigation*, *supra*, 232 Cal.App.3d at p. 585.) Accordingly, we must examine the applicable legal principles before evaluating AVEK's claim that there was no reasonable basis for the trial court's denial of AVEK's motion to disqualify BB&K.

## B. Governing Legal Principles

A motion to disqualify a party's counsel for an alleged conflict of interest implicates several important interests. (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1144.) When considering a disqualification motion, courts have considered such factors as the clients' right to counsel of their choice, the attorney's interest in representing a client, the financial burden on the client if required to replace disqualified counsel, and the potential

11.

that tactical abuse underlays the disqualification proceeding.**9** (*In re Complex Asbestos Litigation*, *supra*, 232 Cal.App.3d at p. 586.)

> "Nevertheless, determining whether a conflict of interest requires disqualification involves more than just the interests of the parties. [¶] A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' (Code Civ. Proc., § 128, subd. (a)(5); [citations].) Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145.)

Importantly, observed the *SpeeDee Oil* court, "judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice." (*Id.* at p. 1144.)

The restrictions on an attorney's ability to represent clients with interests that are potentially or actually adverse are designed to protect two distinct values: to assure the attorney represents his or her client with undivided loyalties, and to assure the attorney will preserve confidential information conveyed by the client to the attorney. (*Sharp v. Next Entertainment*, *Inc.* (2008) 163 Cal.App.4th 410, 427 (*Sharp*); accord, *Flatt*, *supra*, 9 Cal.4th at pp. 282–284.**10**) Both values can be undermined when the attorney undertakes simultaneously to represent clients with potentially or actually adverse interests, while only the latter interest is implicated when the attorney seeks to represent a

---

**9**The courts have recognized the concerns associated with disqualification motions can be magnified when the impacts of disqualification are not limited to just the private litigants involved in the motion but would extend to an extensive group of other litigants interested in the litigation. (*In re Complex Asbestos Litigation*, *supra*, 232 Cal.App.3d at p. 586.)

**10**Although *Flatt*'s synthesis of the governing concepts provides a helpful distillation of some of the relevant principles, we recognize its discussion is only of marginal assistance because *Flatt* was not evaluating the propriety of a ruling on a disqualification motion, but was instead examining whether a malpractice action was viable. (*Flatt*, *supra*, 9 Cal.4th at pp. 278–279.)

12.

new client whose interests are potentially or actually adverse to the interests of a former client. Consequently, the courts have segregated the two separate interests and formulated distinct tests to determine the circumstances under which disqualification is required. (*Flatt*, *supra*, at pp. 282–283.)

"Where the potential conflict is one that arises from the *successive* representation of clients with potentially adverse interests, the courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality*." (*Flatt*, *supra*, 9 Cal.4th at p. 283.) A motion brought under these circumstances, in which the former client seeks to disqualify his former attorney from serving as counsel to a successive client in litigation adverse to the interests of the former client, requires that "the [former] client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Ibid*.) This "substantial relationship" ensures the new client will only be deprived of his counsel of choice where necessary to protect the former client's interest in ensuring the confidentiality of matters disclosed to the attorney in the course of the prior representation. (*Ibid.*; accord, *Sharp*, *supra*, 163 Cal.App.4th at p. 428.)

In contrast, "[b]oth the interest implicated and the governing test are different … where an attorney's potentially conflicting representations are *simultaneous*.… The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectation—of *loyalty*, rather than confidentiality." (*Flatt*, *supra*, 9 Cal.4th at p. 284.) *Flatt* observed "[e]ven though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required*. Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one." (*Ibid*.)

However, because the right to nonconflicted counsel belongs to the client (*People v. Rocco* (1930) 209 Cal. 68, 73), the client may consent to an attorney undertaking

13.

simultaneous representation of another client with potential (or even actual) adverse interests.

> "Not all conflicts of interest require disqualification. In some situations, the attorney may still represent the client if the client's consent is obtained. [Citations.] 'Giving effect to a client's consent to a conflicting representation might rest either on the ground of contract freedom or on the related ground of personal autonomy of a client to choose whatever champion the client feels is best suited to vindicate the client's legal entitlements.'" (*Zador Corp. v. Kwan* (1995) 31 Cal.App.4th 1285, 1295 [allowing informed consent to concurrent representation acknowledges that "'for the sake of convenience or economy, the parties may well prefer to employ a single counsel'"].)

Permitting a client to give informed consent to a conflicting representation "'is a sensible feature of the law, for it recognizes the autonomy of individuals to make reasoned judgments about the trade-offs that are at stake.'" (*Sharp*, *supra*, 163 Cal.App.4th at p. 430 ["Once the client has been provided with sufficient information about the situation, the client can make a rational choice … based upon full disclosures as to the risks of the representations, the potential conflicts involved, and the alternatives available as required by the particular circumstances"].)

### C. Substantial Evidence Supports the Finding AVEK Consented to BB&K's Representation of District No. 40

The trial court found "AVEK impliedly consented to BB&K's representation of District 40 throughout the 10 plus years of litigation." There is substantial evidentiary support for the finding of "consent."[11] The evidence was undisputed that AVEK was aware (since 2004) that BB&K had undertaken to represent District No. 40. The evidence also showed AVEK acceded to (and accepted the benefits provided by)

---

[11]The issue of an implied agreement or consent is ordinarily a factual question to be resolved by the trier of fact. (Cf. *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [whether parties' conduct created an implied agreement is generally a question of fact]; *Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 829 [same]; *People v. Gibbs* (1971) 16 Cal.App.3d 758, 764 [on motion to suppress "whether there was an implied consent was primarily one of fact for the trial court to determine"].)

14.

BB&K's representation of District No. 40 in the AVGA for over a decade, and AVEK only raised its objection after reaping those benefits. There is also substantial evidence supporting the implied finding AVEK's years of consent to the conflicting representation was an *informed* decision. (*Sharp*, *supra*, 163 Cal.App.4th at p. 430 [informed consent exists when client has sufficient information about "risks of the representations, the potential conflicts involved, and the alternatives available as required by the particular circumstances"]; accord, *Anderson v. Eaton* (1930) 211 Cal. 113, 116 [attorney may not undertake adverse representation without client's "free and intelligent consent given after full knowledge of all the facts and circumstances"].) Specifically, AVEK engaged separate counsel for the AVGA litigation in early 2006 and thereafter has been continuously represented by that independent counsel for the ensuing 10 years; AVEK's separate counsel almost immediately interposed a claim (i.e., to return flow rights) revealing AVEK knew of at least one potentially conflicting interest between AVEK and District No. 40; in 2011, AVEK's separate counsel interposed another argument (i.e., asserting AVEK was not obligated to pay any share of the fees sought by certain class attorneys, see fn. 7, *ante*) revealing AVEK knew of a second potentially conflicting interest between AVEK and District No. 40; AVEK nevertheless continued to accept the benefits provided by BB&K's representation of District No. 40 in the AVGA for many years while cognizant of these conflicts and while being advised by independent counsel.

When a client has made an informed decision to consent to an attorney's concurrent representation of themselves as well as another client with potentially adverse interests, courts will not grant a subsequent motion to disqualify that attorney. (Cf. *Sharp*, *supra*, 163 Cal.App.4th at p. 431 [effective written waivers preclude disqualification]; accord, *Unified Sewerage Agency, etc. v. Jelco Inc.* (9th Cir. 1981) 646 F.2d 1339, 1346, fn. 6 [where client has given informed consent to concurrent representation, client is "estopped from revoking its consent by everyone's reliance on its long-standing position"].) AVEK argues that, notwithstanding the trial court's finding

15.

AVEK consented to BB&K's representation of District No. 40 (with full knowledge of all the relevant circumstances while being represented and counseled by an independent law firm) and reaped the benefits thereof for 10 years, AVEK was entitled to wait until a time of its choosing and nevertheless have its disqualification motion granted because there was no *written* consent by AVEK as contemplated by California Rules of Professional Conduct, former[12] rule 3–310 (former rule 3–310).[13] Certainly, numerous cases have cited the lack of written consent under former rule 3–310 when concluding the client's disqualification motion should be granted. (See, e.g., *Gilbert v. National Corp. for Housing Partnerships* (1999) 71 Cal.App.4th 1240, 1255–1256; *Flatt*, *supra*, 9 Cal.4th at p. 284 [dicta].) However, we are cited no authority holding that, when a client by his conduct manifests an informed consent to concurrent representation of an adverse party, the absence of a writing complying with former rule 3–310 is dispositive (and any other form of consent is irrelevant) when considering a motion to disqualify the attorney.

There is some authority acknowledging a court can find implied consent, thereby barring a client from seeking to disqualify an attorney, even without a written waiver complying with former rule 3–310. For example, in *Elliott v. McFarland Unified School*

---

[12]California's Rules of Professional Conduct underwent comprehensive amendments that took effect November 1, 2018. (*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 85, fn. 7.) However, because the former rules were in effect at all relevant times, and the parties have relied on the former rules both below and in this appeal, we will address the issues with reference to the former Rules of Professional Conduct.

[13]Former rule 3–310(C) provided: "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or [¶] (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." Former rule 3–310 defined "informed written consent" to mean a "written agreement to the representation following written disclosure" (former rule 3–310(A)(2)), and defined "disclosure" to mean "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client" (former rule 3–310(A)(1)).

*Dist.* (1985) 165 Cal.App.3d 562, a client (McFarland) moved to disqualify a law firm from representing another client (Kern) which had interposed a claim against McFarland. McFarland asserted the law firm, which was continuing to represent McFarland on other matters, was barred from representing Kern because it had not obtained an informed written consent from McFarland as required by the governing Rules of Professional Conduct. (*Elliott*, *supra*, at pp. 566–568.) The court ruled the relevant informed consent could be inferred from a joint powers agreement, signed by McFarland, which contemplated that if parties to the joint powers agreement became engaged in a legal dispute resulting in a lawsuit, the party contesting the position "to that of legal counsel employed as set forth herein … shall secure [its own] separate legal counsel at its/their own expense." (*Id*. at p. 568.) In *People v. Johnson* (1980) 105 Cal.App.3d 884, the court again applied the concept of implied consent to an attorney undertaking a representation adverse to a former client, albeit in a different context.[14] In *Johnson*, the defendant argued his guilty plea should be reversed because he had not consented to being prosecuted by a district attorney's office which employed his former attorney. Noting the "'established exception' to the general rule … that the former client may 'expressly or impliedly' consent to the adverse representation" (*People v. Johnson*, *supra*, at p. 892), the court observed the defendant was aware of the facts but elected to raise no

---

[14]In *Health Maintenance Network v. Blue Cross of So. California* (1988) 202 Cal.App.3d 1043, the court also employed the concept of implied consent to an attorney undertaking a representation adverse to a former client, albeit in a context divorced from a disqualification motion. There, the plaintiff obtained an injunction barring the defendant from interfering with the plaintiff's operations. (*Id*. at pp. 1048–1049.) The defendant asserted the plaintiff was barred from equitable relief since it had unclean hands because, among other things, the plaintiff's attorney had formerly represented the defendant and violated his fiduciary obligations to the defendant by taking actions on behalf of the plaintiff that were adverse to the defendant. The court rejected the argument in part because "a client or former client may consent to an attorney's acceptance of adverse employment and *such consent may be implied by conduct*" (*id*. at p. 1064, italics added), and the court found the defendant's conduct constituted implicit consent to any adverse representation. (*Ibid*.) Federal courts have reached analogous conclusions. (See, e.g., *Rossworm v. Pittsburgh Corning Corp.* (N.D.N.Y. 1979) 468 F.Supp. 168, 175.)

objection and instead negotiated a favorable plea agreement and concluded that "in the circumstances of this case, the defendant impliedly consented to the adverse representation." (*Ibid.*)

Finally, in *River West*, *Inc. v. Nickel* (1987) 188 Cal.App.3d 1297, a former client moved to disqualify the attorney from representing the current client in litigation against the former client. The current client, although conceding the attorney's representation of the former client was on a matter "substantially related" to the current litigation, asserted the delay in bringing the disqualification motion was so excessive that the former client impliedly waived any conflict. (*Id*. at pp. 1300–1301.) The court concluded that, when the facts show the former client unreasonably delays in bringing the disqualification motion and such delay causes great prejudice to the current client, a court may find "an implied waiver of the right to disqualify [the attorney] … [¶] [*and*] *an implied consent* to [the attorney] proceeding on behalf of [the current client]." (*Id*. at p. 1313, italics added.)

AVEK argues the cases applying or recognizing implied consent involved *successive* representations and hence have no application where, like the present case, the law firm *concurrently* represented clients possessing adverse interests. Instead, citing former rule 3–310 and the mentions of that rule by the courts in *SpeeDee Oil*, *State Farm Mutual Automobile Ins. Co. v. Federal Ins. Co.* (1999) 72 Cal.App.4th 1422 (*State Farm*) and *Blue Water Sunset*, *LLC v. Markowitz* (2011) 192 Cal.App.4th 477 (*Blue Water*), AVEK argues the "automatic" rule of disqualification applies in concurrent representation cases absent written consent complying with former rule 3–310.[15] We are unpersuaded by AVEK's arguments. Insofar as AVEK asserts noncompliance with the "writing" element of former rule 3–310 is itself dispositive, we reject that assertion.

---

[15]AVEK also relies on the statement in *Flatt*, *supra*, 9 Cal.4th at page 284, that "in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one." However, because *Flatt* did not evaluate the propriety of a ruling on a disqualification motion (see fn. 10, *ante*), much less evaluate whether *only* written consent provided adequate grounds to deny a disqualification motion in a concurrent representation context, *Flatt* provides little illumination for our analysis.

18.

Certainly, courts analyzing questions of disqualification may obtain guidance from the Rules of Professional Conduct, but "the California State Bar's Rules of Professional Conduct govern attorney discipline; they do not create standards for disqualification in the courts." (*Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 792; accord, *Hetos Investments*, *Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 47 ["a violation of a rule of the State Bar Rules of Professional Conduct does not necessarily compel disqualification"]; see *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 303 [violation of disciplinary rule does not necessarily warrant disqualification because "disciplinary rules promulgated by bar associations are not intended to be used as procedural weapons in disqualification cases"].) Indeed, the former Rules of Professional Conduct expressly cautioned the rules "are intended to regulate professional conduct of members of the State Bar through discipline … [¶] … [¶] [and n]othing in these rules shall be deemed to create, augment, diminish, or eliminate any substantive legal duty of lawyers or the non-disciplinary consequences of violating such a duty." (Former rule 1–100(A); accord, *San Francisco Unified School Dist. ex rel. Contreras v. First Student*, *Inc.* (2103) 213 Cal.App.4th 1212, 1230 [the "'propriety of punishment for violation of the Rules of Professional Conduct is a matter within the purview of the State Bar, not of a court presiding over the affected case. [Citations.] Instead, what the court must do is focus on identifying an appropriate remedy for whatever *improper effect* the attorney's misconduct may have had in the case before it'"].)

AVEK's reliance on *SpeeDee Oil*, *State Farm*, and *Blue Water* for the proposition that implied consent can never apply to concurrent representations is equally unpersuasive. The *SpeeDee Oil* court, while it did examine a disqualification motion where there had been a brief period of concurrent representation, had no occasion to determine whether the client seeking to disqualify the attorney had impliedly consented

19.

to that attorney concurrently representing another party with an adverse interest.[16] Moreover, the *SpeeDee Oil* court specifically admonished that "judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice … [and *d]epending on the circumstances*, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1144–1145, italics added.) Indeed, the court immediately thereafter observed such concerns "are almost entirely absent in this case" (*id.* at p. 1145, fn. 2), noting the moving client (1) was unaware of the law firm's contacts with the adverse party, (2) objected immediately to the law firm's involvement in the case, and (3) such objection was sufficiently timely that there had not been any substantial amounts of time or resources invested into the relationship between the law firm and the adverse party. The *SpeeDee Oil* court carefully noted that "[t]his case is not one where, despite knowing the pertinent facts, a party unreasonably delayed seeking disqualification and so caused its opponent significant prejudice. ([Citing] *River West*, *Inc. v. Nickel*, *supra*, 188

---

[16]The *SpeeDee Oil* court's principal focus was twofold: first, whether the particular attorney's preliminary consultations with the client's representatives about the subject matter of the pending case gave rise to an attorney-client relationship between that attorney and the client for purposes of a conflict of interest analysis; second, assuming an attorney-client relationship was created between that attorney and the client, whether the law firm for whom that attorney was "of counsel" could be disqualified by imputing the "of counsel" attorney's conflict of interest to the law firm. (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1143.) It answered the first question in the affirmative because, while the attorney's preliminary consultations with the client's representatives occurred over a very brief time period, the attorney obtained a substantial amount of material confidential information. (*Id.* at pp. 1148–1152.) It then answered the second question in the affirmative because an "of counsel" designation requires the attorney to enjoy "close, personal, continuous, and regular relationships with their affiliated firms" who "frequently will have occasion to share client confidences in the course of exchanging advice and performing legal services for those clients." (*Id.* at p. 1155.) Under these circumstances, concluded the *SpeeDee Oil* court, the same "need to protect client confidences [which] can cause one attorney's conflict of interest disqualification to be imputed to other attorneys in the same firm" (*id.* at p. 1153) had equal application when such information is acquired by an "of counsel" attorney. (*Id.* at 1155–1156.)

Cal.App.3d at pp. 1311–1313.) There was no basis for concern here that one party, by belatedly moving to disqualify opposing counsel, was attempting to disrupt a case at a critical juncture. Similarly, this case was not one where a party tried to increase an opponent's litigation burdens by seeking disqualification only after the challenged counsel performed a substantial amount of work. Consequently, *we do not comment on the relative weight these concerns might deserve in deciding a disqualification motion based on a conflict of interest.*" (*Ibid.*, italics added.)

For these reasons, we are unpersuaded by AVEK's argument that *SpeeDee Oil*, which did examine a disqualification motion involving a brief period of concurrent representation, supports the proposition that implied consent or implied waiver can never apply to concurrent representations. Instead, the *SpeeDee Oil* caveats described above suggest the majority opinion would permit implied consent or implied waiver to be a factor in considering a disqualification motion in a concurrent representation context.[17]

We are equally unconvinced by AVEK's reliance on *State Farm*, *supra*, 72 Cal.App.4th 1422 for the proposition implied consent can never be applied to concurrent representations. Certainly, the *State Farm* court noted there was a federal district court decision holding implied consent was unavailable in a concurrent representation context. (*Id.* at pp. 1434–1435.) However, *State Farm* ultimately concluded the *facts* relied on to

---

[17]Our conclusion that SpeeDee Oil's caveats permit a court to examine facts giving rise to an implied consent or implied waiver when addressing a disqualification motion in a concurrent representation context is buttressed by the fact that Justice Mosk wrote a concurring opinion that (while agreeing with the result) opined, contrary to the majority, that "this matter involves a straight-forward question of law, not of fact." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p 1157 (conc. opn. of Mosk, J.).) Justice Mosk explained he wrote separately because "[t]he majority suggest, in my view incorrectly, that it matters how long the conflict herein lasted, how promptly [the client] sought to disqualify [the attorney], and whether attorneys from the [attorney's] firm actually had access to [the client's] confidences. The precise details of the interactions between [the attorney] and the [attorney's] firm and their clients are not the point.… Regardless whether any attorneys in the [attorney's] firm apart from [the attorney] were actually exposed to [the client's] confidences or instituted any formal 'ethical screen' to preserve confidentiality, disqualification in these circumstances was automatic, as a breach of the twin duties of loyalty and confidentiality owed by an attorney to his client." (*Ibid.*)

21.

support the claimed implied consent provided "no basis for finding that [the client] impliedly consented to the adverse representation" (*id*. at p. 1435) because (1) the client was not actually aware of any conflict until the adverse action was filed and (2) the client did not unreasonably delay seeking disqualification. (*Id*. at pp. 1432–1434.) Thus, *State Farm* rejected implied consent on its facts rather than as a matter of law. Moreover, Justice Dibiaso's concurring opinion in *State Farm* specifically cautioned he was "not convinced the concept of implied consent is of relevance solely to cases involving successive representation. At least one court (*In re Lee G*. (1991) 1 Cal.App.4th 17, 27) has not foreclosed the application of the theory where concurrent representation is in issue. I realize that a federal district court, applying its view of California law, has held that implied consent (based upon inaction and delay) may be raised only when the representation is successive (*Blecher & Collins*, *P.C. v. Northwest Airlines*, *Inc*. (C.D.Cal. 1994) 858 F.Supp. 1442, 1455) but I would be prepared in a proper case to critically examine the district court's conclusion." (*State Farm*, *supra*, 72 Cal.App.4th at p. 1436 (conc. opn. of Dibiaso, Acting P.J.).) Thus, while Justice Dibiaso viewed the question as moot, specifically citing the absence of evidence the client either had taken any actions while actually aware of the conflict or had unreasonably delayed its motion to disqualify the conflicted counsel, he clearly left open the possibility that appropriate facts could support application of implied consent in a concurrent representation context. (*Id*. at pp. 1436–1437.)

The final case relied on by AVEK, *Blue Water*, *supra*, 192 Cal.App.4th 477, nowhere holds a court considering a disqualification motion in a concurrent representation context must disregard evidence of implied consent to the conflicting representation. Instead, *Blue Water* merely cited *Flatt* and *State Farm* for the generic proposition that when an attorney "simultaneously represents two clients with adverse interests, automatic disqualification is the rule in all but a few instances" (*Blue Water*, *supra*, at p. 487), but it neither described what those "few instances" might be nor

22.

(contrary to AVEK's appellate claim) stated that those "few instances" required strict compliance with former rule 3–310.

The foregoing survey of the relevant authorities convinces us that, where there is substantial evidence supporting the factual determination that the client made an informed decision to agree to a law firm's concurrent representation of themselves as well as another client with potentially adverse interests, no authority precludes a court from denying a subsequent motion to disqualify that attorney based on implied consent or holds (as AVEK contends) that the absence of a written confirmation of that consent is dispositive. The *SpeeDee Oil* court admonished that "judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1144.) Where a party's course of conduct under all of the circumstances reflects a knowing, informed choice to permit continued concurrent representation notwithstanding potential or actual adverse interests, we conclude that requiring a writing as the sine qua non of effective consent would celebrate literalism and elevate form over substance to the detriment of substantial justice for the other parties.

We therefore conclude a trial court may deny a disqualification motion when it finds the moving party by its conduct gave knowing and informed consent to the concurrent representation of themselves and another client. Because we have previously explained there is substantial evidence to support the finding AVEK impliedly gave such consent to the concurrent representation, the trial court's denial of AVEK's motion must be affirmed.

### D. The Trial Court Did Not Abuse Its Discretion in Denying the Disqualification Motion Based on Unreasonable Delay

Even if implied consent were not a legally sufficient basis for denying AVEK's disqualification motion, it is clear that "attorney disqualification can be impliedly waived by failing to bring the motion in a timely manner." (*Liberty National Enterprises*, *L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 844 (*Liberty*); accord, *Trust Corp. of Montana v. Piper Aircraft Corp.* (9th Cir. 1983) 701 F.2d 85, 87–88.) *SpeeDee Oil*

23.

recognized as much when it noted that "[*d*]*epending on the circumstances*" (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145, italics added), a disqualification motion permits a trial court to consider such things as the financial burden that would accompany requiring a client to replace a disqualified counsel after the challenged counsel performed a substantial amount of work, and whether "despite knowing the pertinent facts, a party unreasonably delayed seeking disqualification and so caused its opponent significant prejudice." (*Id*. at fn. 2.)

> "[T]o result in a waiver, the 'delay [and] … the prejudice to the opponent must be extreme.' [*Liberty*, *supra*, 194 Cal.App.4th at p. 845.] Factors relevant to the reasonableness of a delay include the 'stage of litigation at which the disqualification motion is made' and the complexity of the case. (*Id*. at p. 846.) Delay can also be 'an indication that the alleged breach of confidentiality was not seen as serious or substantial by the moving party,' and can suggest 'the possibility that the "party brought the motion as a tactical device …."' (*Id*. at p. 847.) 'If the opposing party makes a prima facie showing of extreme delay and prejudice, the burden then shifts to the moving party to justify the delay.' (*Fiduciary Trust Internat. of California v. Superior Court* (2013) 218 Cal.App.4th 465, 490.)" (*Ontiveros v. Constable* (2016) 245 Cal.App.4th 686, 701.)

The trial court concluded all of the relevant factors militated in favor of finding AVEK was estopped[18] from seeking to disqualify BB&K: AVEK waited 10 years to raise the issue; AVEK reaped substantial benefits from BB&K's representation of District No. 40 for those years; District No. 40 would suffer substantial financial cost if required to replace BB&K; the parties (as well as the courts and other parties interested in the AVGA cases) would be harmed if this ongoing litigation were deprived of BB&K's knowledge and experience; and, there was no evidence that disqualification was necessary as a prophylactic measure to protect AVEK's confidential communications

---

[18]Although courts such as *Liberty*, *supra*, 194 Cal.App.4th 839 have used the nomenclature of "waiver" (*id*. at p. 845), we believe that "estoppel" more accurately describes the operative principles. (See *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 486–487 [discussing distinction between "waiver" and "estoppel" and noting latter involves prejudicial reliance by the party asserting estoppel].)

from being conveyed to District No. 40. Moreover, AVEK's disqualification motion made no effort to carry its burden of showing justification for the delay. (*Ontiveros v. Constable*, *supra*, 245 Cal.App.4th at p. 701.) These facts provide ample justification for the implied finding the delay was unreasonable and extremely prejudicial. (*McDermott Will & Emery LLP v. Superior Court*, *supra*, 10 Cal.App.5th at p. 1110.)

AVEK does not argue on appeal that any of the findings on the relevant factors supporting estoppel are lacking substantial evidentiary support. Instead, AVEK asserts that delay in bringing a disqualification motion is *only* relevant in a successive representation context and cannot be considered when the disqualification motion is brought asserting automatic disqualification based on a concurrent representation. There is no definitive California case on whether unreasonable delay with resulting prejudice can result in estoppel outside of the successive representation context.[19] (See *Ontiveros v. Constable*, *supra*, 245 Cal.App.4th at p. 701 & fn. 9 [noting apparent conflict between *Blue Water*, *supra*, 192 Cal.App.4th 477 and *Forrest v. Baeza* (1997) 58 Cal.App.4th 65 but finding it was unnecessary to decide question].) In *Forrest v. Baeza*, the court examined a motion to disqualify counsel in a concurrent representation context. The court evaluated whether delay barred relief by the moving party rather than summarily rejecting any consideration of delay. (*Forrest v. Baeza*, *supra*, at pp. 77–78.) Other courts have also considered whether delay barred relief by the moving party in a concurrent representation context. (See, e.g., *Miller v. Alagna* (C.D.Cal. 2000) 138 F.Supp.2d 1252, 1256–1260.) In contrast, *Blue Water* contains language suggesting the rule of automatic disqualification applicable to concurrent representations obviates consideration of delay. (*Blue Water*, *supra*, at p. 490 [challenged attorney had

---

[19]AVEK quotes a federal district court case, *In re Jaeger* (Bankr. C.D.Cal. 1997) 213 B.R. 578, stating a concurrent representation of clients "in effect gives a wild card to each of the clients. At any time thereafter … any of the clients can play the card and require the withdrawal." (*Id.* at p. 586.) We are not persuaded *In re Jaeger* correctly evaluated California law and therefore disregard it. (Cf. *Whiteley v. Phillip Morris, Inc.* (2004) 117 Cal.App.4th 635, 690 [federal court decisions on state law issues not controlling].)

25.

"knowingly agreed to represent conflicting interests at the demurrer hearing. He therefore cannot avoid the rule of automatic disqualification. Consequently, we need not reach the issue of delay"].)

We conclude the "automatic disqualification" standard applicable to concurrent representations is not incompatible with estoppel considerations. The *SpeeDee Oil* court, addressing a disqualification motion arising because of a brief period of concurrent representation, expressly left open whether unreasonable delay could make estoppel principles relevant to the disqualification motion.[20] (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1144–1145 & fn. 2.) The *Blue Water* court made no effort to reconcile its language with the *SpeeDee Oil* court's caveat. Moreover, the *Blue Water* court is factually inapt, because it addressed a delay of just over one year (*Blue Water*, *supra*, 192 Cal.App.4th at pp. 483–484) and appears to have lacked the other indicia (such as the late stage of the litigation at which the motion was made or the investments made by the opposing party in the challenged counsel) which have supported other applications of estoppel principles. (See, e.g., *River West*, *Inc. v. Nickel*, *supra*, 188 Cal.App.3d at p. 1313.) Thus, AVEK has cited no relevant case law barring consideration of estoppel principles in a concurrent representation context.

---

[20]AVEK seeks to avoid the *SpeeDee Oil* caveat by asserting it is limited to a law firm's simultaneous representation of clients on separate matters and argues the caveat does not extend to "[t]he most egregious conflict of interest [which] is representation of clients whose interests are directly adverse in the same litigation." (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1147.) AVEK argues BB&K should have been disqualified because BB&K's conflict of interest fell under the "most egregious" rationale. However, that argument was not asserted below, nor was it raised in AVEK's opening brief on appeal, but appears to have been raised for the first time in its reply brief on appeal. "Arguments raised for the first time in the reply brief are considered untimely and may be disregarded by the reviewing court." (*Hernandez v. Vitamin Shoppe Industries, Inc.* (2009) 174 Cal.App.4th 1441, 1461, fn. 10.) Moreover, even if this claim were not forfeited, the record does not support the assertion BB&K represented both District No. 40 and AVEK in the "same litigation." Instead, AVEK was represented by separate counsel in the AVGA litigation while Riddell provided services to AVEK on other matters. Accordingly, the factual predicate for AVEK's untimely appellate argument appears absent.

AVEK also presents no logical reason why the same estoppel principles that courts apply in the successive representation context should not have equal application in the concurrent representation context. Certainly, nothing in former rule 3–310 suggests a basis for treating successive and concurrent representations differently; to the contrary, because former rule 3–310 requires the same written waiver of the conflict of interest regardless of whether the conflict exists between concurrently represented clients (see former rule 3–310(C)) or involves successively represented clients (former rule 3–310(E)), the estoppel principles would apparently also have equal application to both contexts.

AVEK instead appears to argue that, because the disqualification standard applied in a concurrent representation context is described as "automatic," that standard is necessarily antithetical to estoppel principles. However, this argument appears to conflate two distinct concepts. The first concept is what *standards* are to be employed when examining whether a conflict of interest requires disqualification. The second concept is, having identified the appropriate standard for testing disqualification in an otherwise timely motion to disqualify, what *principles* apply to determine whether a client who unreasonably delays in invoking that standard is barred from relief. In timely motions to disqualify, the courts have adopted one type of standard (the "substantial relationship" standard) when the conflict arises between a present client and a formerly represented client, which places on the moving client the burden of demonstrating the requisite ""substantial relationship" between the subjects of the antecedent and current representations.'" (*M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 614.) However, no similar burden is imposed in concurrent representation cases, and the courts have instead described the standard as "automatic" even though the concurrent representations may have nothing in common and there is no risk of harm to the interests of client confidentiality. (See, e.g., *Flatt*, *supra*, 9 Cal.4th at p. 284.)

The descriptors of the appropriate standard to be applied when a timely motion to disqualify is filed has no logical nexus to assessing the impact of an unreasonably delayed motion. Whether the appropriate standard is "substantial relationship" or "automatic," we believe that the question of whether a client's delay estops it from invoking *either* standard is unconnected to which substantive standard will be applied. As previously noted, the majority in *SpeeDee Oil* left open "the relative weight [estoppel] concerns might deserve in deciding a disqualification motion" (*SpeeDee Oil*, *supra*, 20 Cal.4th at p. 1145, fn. 2) rather than adopting Justice Mosk's approach urging that disqualification was automatic regardless of "how long the conflict … lasted [or] how promptly [the client] sought to disqualify [the attorney]." (*Id.* at p. 1157 (conc. opn. of Mosk, J.).) In addition, we perceive no logical reason estoppel principles developed to assess disqualification motions in the successive representation context would not have equal relevance in the concurrent representation context. Accordingly, we conclude the same estoppel principles apply with equal force whether the representation is concurrent or successive.

We cannot conclude the trial court's decision to apply estoppel was either an abuse of discretion or lacked substantial evidentiary support. (*Toyota Motor Sales*, *U.S.A.*, *Inc. v. Superior Court* (1996) 46 Cal.App.4th 778, 782.) *SpeeDee Oil* allows a trial court to consider such things as the client's right to keep his or her chosen counsel, the financial burden that would accompany requiring a client to replace a disqualified counsel after the challenged counsel performed a substantial amount of work, whether the moving party unreasonably delayed in bringing the motion "despite knowing the pertinent facts" (*SpeeDee Oil*, *supra*, 20 Cal.4th at pp. 1144–1145 & fn. 2), and (where the concurrent representation has ended) whether there is a threat to client confidential information if disqualification is not granted. (*Id.* at p. 1147.) The trial court below concluded disqualification would deprive District No. 40 of its chosen counsel, that District No. 40 (as well as many other parties) would suffer serious detriment from

disqualification, and that AVEK unreasonably delayed seeking disqualification. The court also noted the concurrent representation had ended and there was no evidence to create a concern that AVEK's confidential information would be endangered if disqualification was not granted. The trial court's decision to estop AVEK from disqualifying BB&K is supported by substantial evidence and was not an abuse of discretion.

## DISPOSITION

The order is affirmed. Costs on appeal are awarded to respondent.

_____
PEÑA, Acting P.J.

WE CONCUR:


_____
SMITH, J.


_____
SNAUFFER, J.